**UNITED STATES of America,**
**Plaintiff,**

v.

**CENTRAL GULF STEAMSHIP CORPO-RATION, a corporation, and Robert H. Wall, Inc., a corporation, Defendants.**

**UNITED STATES of America,**
**Plaintiff,**

v.

**ROBERT H. WALL, INC., a corporation, and Central Gulf Steamship Corporation, a corporation, Defendants.**

**Nos. 7526, 7734.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Oct. 23, 1970.

Anthony W. Gross, Atty., Admiralty and Shipping Section, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

John R. Peters, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendants.

CASSIBRY, District Judge:

The pleadings in these two consolidated cases, in all material respects, are identical. For the purpose of obtaining jurisdiction over the defendants, plaintiff commenced two separate but similar actions, one in this court and one in the United States District Court for the District of Columbia. In both suits, the United States seeks to recover from Central Gulf Steamship Corporation and Robert H. Wall, Inc., for damages it suffered due to insect infestation of two quantities of bagged wheat flour which the defendants had contracted to transport to a foreign port. Admiralty Action No. 7526 was commenced in this court. The District of Columbia suit was transferred to this court in October, 1965 and was assigned Admiralty Action No. 7734. The two suits were consolidated by Order of this court dated January 11, 1966. Defendants have answered each of the two complaints. No other pleadings have been filed.

In addition to the witnesses who testified at the trial, several witnesses testified by deposition and, by agreement of the parties, the testimony of two witnesses was accepted in affidavit form. Many facts were stipulated to by the parties.[1] The cause came on for trial on April 23 and 24, 1970, was argued by counsel for the respective parties and submitted.

Whereupon, and upon consideration thereof, the court now makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### 1.

The flour cargo involved in this case was purchased by the United States as part of its program of furnishing economic aid to needy foreign countries. The United States Department of Agriculture's Minneapolis office purchased the subject flour for donation by the people of the United States to the United Nations Relief and Works Agency (UNRWA). The United States paid and arranged for transportation of the flour by rail from the mill site to the port of export, New Orleans. It also paid and arranged for ocean transportation from New Orleans to the port of unloading, Port Said. UNRWA has assigned to the United States any and all claims it may have had arising out of the loss or damage of the subject flour.

### The Contract Between the Parties

### 2.

Under a contract completed in Washington, D. C., defendants agreed to load and carry 200 metric tons, more or less, of flour from New Orleans to Port Said. At about the same time, defendants, by a separate agreement with the United States, agreed to load and carry 1,834 metric tons of flour from Pensacola, Florida, to Aquaba, Jordan, with the vessel to load and sail on July 21, 1964. The Pensacola-Aquaba shipment and related events are the subject of a separate action pending in another section of this court. To some extent, however, the events surrounding the Pensacola-Aquaba shipment are relevant in the instant cases.

### 3.

The signing of the contracts referred to above came about in this fashion. The Department of Agriculture's Minneapolis office requested that the office of

1. A number of the depositions received in evidence are on file in the companion cases of United States v. Central Gulf Steamship Corporation and Robert H. Wall, Inc., Consolidated Admiralty Action Nos. 7538–B and 7735–B.

Mr. Joseph A. Ryan, Jr., Chief of the Transportation Services Division of the U.S.D.A., Washington, D. C., arrange ocean transportation for some 200 metric tons of bagged wheat flour from New Orleans to Port Said and some 1,834 metric tons of bagged wheat flour from Pensacola to Aquaba. The Minneapolis office also informed Mr. Ryan of the dates when the respective cargos would be available at the ports of New Orleans and Pensacola for loading.

4.

On May 21, 1964, Ryan's Washington office telephoned nine steamship lines and solicited offers on the two shipments. Defendant Central Gulf (through its agent, defendant Robert H. Wall) and one other company submitted offers. Central Gulf's offer was accepted because its loading dates and estimated dates of arrival at the foreign ports more closely fit the Government's needs.

5.

The two contracts between plaintiff and defendants were not evidenced in writing until on or about June 25, 1964. In each case, the contract was signed by Ryan for the Government and by Wall for the defendants.

6.

Defendants contend that Wall Exhibit 1 and 2 form part of the written contracts between the parties. But these documents were unilateral writings of defendant Wall and were not countersigned or otherwise agreed to by the Government.

7.

The New Orleans contract provided that defendants' vessel or vessels would load the flour at New Orleans on June 30, 1964, and that the vessel or vessels would sail on the same date for Port Said. The contract loading and sailing date for the Pensacola flour was July 21, 1964.

8.

As stated above, U.S.D.A.'s Washington office arranged for the ocean transportation of the flour from New Orleans to Port Said. In the meantime, U.S.D.A.'s Minneapolis office purchased 44,093 bags of wheat bread flour (of 100 net pounds each) from three mills in the United States.

9.

U.S.D.A. purchased 31,708 bags of the said flour from International Milling Company, Minneapolis, for $5.14 per 100 pound bag. The Government's damage claim on this lot of flour relates to 1,000 bags. The parties have stipulated that the purchase price of $5,140 for these 1,000 bags of flour was a reasonable price.

10.

U.S.D.A. purchased another 9.407 bags of wheat bread flour from Nebraska Consolidated Mills, Omaha, for $5.29 per 100 pound bag. The Government's damage claim on this lot of flour relates to 800 bags. The parties have stipulated that the purchase price of $4,232 for these 800 bags of flour was a reasonable price.

11.

By a third contract, U.S.D.A. purchased some 3,000 bags of flour from Gilster Milling Company, Chester, Illinois. This quantity of flour is of little importance in this suit, except that it formed part of the flour cargo to be loaded and lifted by defendants at the Port of New Orleans.

12.

The 44,093 bags of flour arrived from the three mills at the Port of New Orleans in 50 railroad cars on various dates from June 8 through June 30, 1964. In this suit, we are particularly concerned with 1,000 bags of flour which arrived at the Port of New Orleans in railroad car UP-163571, and with 800 bags of

flour which arrived at that Port in railroad car IC–29563.

*Procedures Employed Prior to Delivery of Flour*

13.

The 1,000 bags of flour which arrived in car UP–163571 were part of the 31,708 bags purchased from International Milling Company. This flour was milled at the company's mill in North Kansas City, Missouri. Edward B. Hite, the Head Miller, testified in detail concerning the company's milling procedures. The Department of Agriculture employed several inspectors (called "Commodity Samplers") at the North Kansas City mill site. These commodity samplers performed their duties under the direction and supervision of Charles H. Roy, of U.S.D.A.'s Kansas City office.

14.

The 800 bags of flour which arrived in car IC–29563 were part of the 9,407 bags purchased from Nebraska Consolidated Mills. This flour was milled at the company's mill in Decatur, Alabama. Clyde Yost, the Mill Method Manager, explained in detail the company's milling procedures. The procedures employed at this mill were substantially the same as those used at the North Kansas City Mill.

15.

It was conceded by counsel for defendants during oral argument that there were no insects in the flour when it left the respective mills. This fact is supported by substantial testimony describing in detail the milling procedures and the various inspections and sampling which are employed to insure against infestation. Moreover, flour samples taken by the Government inspectors during the summer of 1964 were examined and analyzed by chemist Edward Chapman, who observed no evidence of insects. Also, Dr. Paul Boyles, whose expert entomology testimony is discussed below, stated that the types of insects (and their eggs) found in this flour were too large to pass through the 10XX silk screen used in filtering procedures at the mills.

16.

The defendants contend, however, that the infestation occurred in the railroad cars enroute to New Orleans, or at least that the United States has not borne its burden of proving that the flour was received by the defendants at New Orleans in good condition and without infestation.

17.

The evidence shows that at the North Kansas City Mill, mill personnel prepared the railroad car prior to loading of the bagged flour. The car was thoroughly cleaned with brooms and brushes. The interior surfaces of the car were sprayed either with a two percent solution of Malathion (one gallon of the solution used for each car), or another fumigant generally recognized by the milling industry as suitable for the purpose. After spraying, the walls and floor were lined with heavy paper. After the car was loaded, the top layer of bags was covered with heavy paper, door protectors were placed across the doorway, and the car doors were closed and sealed.

18.

Before the mill personnel began its preparation of the railroad car, the Government sampler or inspector inspected the car for its cleanliness, staunchness and over-all suitability. The Government inspector observed the mill's preparation of the car and the mill was not permitted to load a car unless it was first approved by him. The Government inspector periodically observed the loading of the bags into the railroad car. He observed the preparation and fumigation of the car and the fixing of the Government seal.

**19.**

The UP car departed from the North Kansas City Mill on June 12, 1964, and arrived at the Port of New Orleans on June 18, 1964.

**20.**

At the Decatur mill, mill personnel inspected the railroad car and rejected the car if it was not suitable. When accepted, the car was thoroughly cleaned with brooms and brushes and was fumigated by spraying the interior surfaces of the car with a commercial residual insect spray. The witness Yost stated that the type of insect spray used by the Decatur mill had been changed from time to time because of changing state and federal specifications and because of the availability of improved products. For these reasons, Yost was unable to recall the chemical composition of the spray used in the summer of 1964, but stated that the spray used was one which was generally recognized in the milling industry as suitable for the purpose.

**21.**

The IC car departed Decatur on June 11, 1964, and arrived at the Port of New Orleans on June 16, 1964.

*Government Delivers the Flour to Defendants*

**22.**

U.S.D.A.'s Minneapolis office, having purchased the flour from the three mills and having obtained bills of lading from the rail carriers, referred the matter to the U.S.D.A. Houston office for further handling. Mr. Felton Overbey was in charge of the Houston office. Overbey's office was informed of the actions taken by the Minneapolis and Washington offices and received copies of the rail bills of lading.

**23.**

Upon arrival, or shortly before arrival, of each rail car at the Port of New Orleans, Overbey authorized the rail carriers to release the car to defendant Central Gulf.

**24.**

Having received the authorizations from Overbey, the rail carriers informed Central Gulf by telephone of the date and time when particular cars were to be unloaded. The railroad cars then were unloaded in the presence of employees of Central Gulf. After each car was unloaded, Central Gulf's employee signed a receipt evidencing delivery of the car's contents to Central Gulf. Employees of Central Gulf designated the place where the unloaded bags of flour were to be stacked and stored in the Bienville Street Wharf, in space leased by Central Gulf from the Port Authority.

**25.**

The above procedure was followed with respect to the two railroad cars of flour involved here. Central Gulf signed two receipts evidencing acceptance of the UP car lot and two similar receipts for the IC car lot. On none of these four receipts did Central Gulf note any discrepancies in the condition or weight of the flour received, other than that a few bags were torn and recoopered. According to the dated receipts, Central Gulf accepted delivery of the UP car lot on June 30, 1964, and the IC car lot on June 22, 1964.

**26.**

At no time during the summer of 1964 was Overbey's office represented by anyone at the Port of New Orleans. This was standard procedure because of the lack of the personnel necessary to cover any of the several ports handling U.S.D.A.'s cargo serviced by Overbey's office.

*Events Which Occurred During Defendants' Custody of the Flour*

**27.**

As stated above, the contract between the parties called for the flour to be

lifted by defendants' vessel on June 30, 1964, and the entire flour cargo was in position for lifting by that date.

28.

As the lifting date of June 30 approached, Central Gulf's representatives informed U.S.D.A.'s representatives that the vessel would be a few days late arriving at New Orleans. Thereafter further advices were given by Central Gulf of additional delays in the vessel's arrival date, each announced delay being of two or three days. These delays were due to casualties suffered by two of Central Gulf's vessels and delays in the movement of others.

29.

This situation continued until the latter part of July 1964, when defendants' representative, Robert Wall, proposed to U.S.D.A.'s Joseph Ryan, that defendants be permitted to substitute a foreign flag vessel to carry the flour cargoes under both the New Orleans-Port Said and the Pensacola-Jordan contracts. The substitution could not be made without U.S.D.A.'s consent. Ryan refused the request because under United States statutes at least fifty percent of Government owned cargo must be carried in American bottoms; because the State Department had requested the Department of Agriculture to maximize the use of United States flag vessels for balance of payments reasons; because the contracts with defendants had been fixed for United States flag vessels; because before accepting defendants' offers, Ryan's office had rejected responsive offers from another United States flag steamship company; because Ryan's office never before had granted a similar request for substitution of a foreign bottom for an American bottom; and because Ryan doubted that he had the authority to agree to the requested substitution.

30.

Defendants did not present a vessel at New Orleans until July 29, 1964, when the SS GREEN RIDGE called at that port and lifted 29,288 bags of the flour cargo. The GREEN RIDGE did not have space for the remaining flour and left 14,805 bags of flour in New Orleans.

31.

Defendants did not call for the remaining 14,805 bags of flour until August 13, 1964, when the SS GREEN VALLEY called at New Orleans. In anticipation of the GREEN VALLEY's arrival, Overbey's office requested the Plant Quarantine Division, New Orleans office, to inspect the remaining flour for the purpose of determining whether Plant Quarantine would issue a Phytosanitary Certificate. On August 10, 1964 (three days before the GREEN VALLEY's arrival) Mr. Carl Schlueter of the Plant Quarantine Division inspected the remaining 14,805 bags of flour and found live insects both outside and inside bags of two car lots. Accordingly, the Plant Quarantine Division issued a Phytosanitary Certificate for 13,005 bags of flour, and rejected the 1,800 bags of flour unloaded from railroad cars UP–163571 and IC–29563.

32.

The Plant Quarantine inspector, Schlueter, took samples of the insects he found and gave them to an insect identifier, Henry Shifflette, for identification. Shifflette identified the following four species of insects: Lasioderma serricorne (Fab.), Carpophilus hemipterus (L.), Tribolium casteneum (Hbst.), and Oryzaephilus surinamensis (L.).

33.

The Plant Quarantine Division notified Overbey of its findings and Overbey instructed James Hickman of his office to travel from Houston to New Orleans to inspect the infested flour. Hickman made his inspection of the UP and IC lots at the Bienville Street Wharf on August 13, 1964; and he found a heavy infestation of live insects,

in all stages of growth, both inside and outside the bags of flour.

## 34.

Based upon the reports from Plant Quarantine and Hickman of insect infestation in the 1,800 bags of flour from the UP and IC car lots, Overbey rejected the 1,800 bags as being unfit for human consumption.

## 35.

Mr. James McClellan, a U. S. Pure Food and Drug officer, testified that the presence of insects, whether alive or dead, inside bags of wheat bread flour renders the flour unfit for human consumption, and that no degree of filth in human food is tolerated.

## 36.

The Government did not in any manner excuse defendants for their delay in lifting the flour at the Port of New Orleans, nor did the Government in any way waive or release defendants from liability for damages. In fact, none of the Government employees who had any communication with defendants possessed the authority to make any such waiver or release.

## 37.

Dr. Paul Boles, an experienced and well-qualified Government entomologist, explained the habits, life cycles and distribution of the four species of insects here involved. *Lasioderma serricorne (L.)* is commonly called the cigarette beetle. *Carpophilus hemipterus (L.)* is sometimes called the dried fruit beetle. *Tribolium casteneum (Hbst.)* is commonly called the red flour beetle. *Oryzaephilus surinamensis (L.)* is commonly called the saw-toothed beetle.

## 38.

The cigarette beetle is often found in tobacco and grain. The dried fruit beetle is attracted to decaying materials. The red flour beetle and the saw-toothed grain beetle usually are found in cereal products. All four insects are cosmopolitan. None are internal feeders. All are strong flyers. The life span, from egg to adult, of the four insects is about 30 days, depending upon conditions. The summer months in New Orleans present ideal conditions for their growth and development.

## 39.

Upon the opening of a railroad car carrying bagged bread flour, proper procedure requires that, before unloading is commenced, all visible bags and portions of the car be carefully inspected for evidence of infestation. If evidence of infestation is found, the car should be fumigated immediately. Overbey testified that over the years the bagged flour contents of hundreds of railroad cars have been saved for human consumption by immediate fumigation of the car when, upon opening of the car, evidence of infestation was found.

## 40.

Proper procedure also requires that, as the flour is unloaded, each bag should be examined and particular notice should be taken of the seam areas. When the car has been unloaded, all car surfaces should again be inspected carefully.

## 41.

Proper procedure requires that a stack of bagged bread flour stored in a warehouse be covered with a tarpaulin securely fastened. The flour should be frequently inspected for evidence of infestation, and particular notice should be taken of the condition of the bags, the conditions of the surrounding area, torn or otherwise damaged bags, spillages of flour, and the adequacy and efficiency of the warehouse personnel. If evidence of infestation is found in a stack of flour, it should be fumigated immediately. If the infestation has not entered inside the bags, the fumigation can effectively save the flour so as to remain suitable for human consumption. If the infestation has entered the bags but is localized, fumigation can effectively save

the surrounding stacks of flour not yet so infested.

### 42.

Dr. Boles explained that when food products are found infested in a warehouse it is often impossible for experts to determine the source or sources of the infestation. Infestation can originate in the grain before it reaches the mill, or during the milling procedures, or during transit by rail, or during storage in the warehouse. Dr. Boles said he could not form a definite opinion as to the origin of the infestation in this case because he had not been given sufficient information concerning the history of the 1,800 bags of infested flour.

### Defendants' Care of the Flour

### 43.

The Government has shown its delivery of the UP carlot of 1,000 bags of flour and of the IC carlot of 800 bags of flour to defendant Central Gulf at the Port of New Orleans. Defendants have offered no evidence concerning the actions taken by them, if any, with respect to inspecting the incoming railroad cars, inspecting the flour upon arrival or at any subsequent time, inspecting and maintaining the warehouse facilities in good condition, or in otherwise caring for, preserving and protecting the flour. Only one of defendants' witnesses testified that he had ever seen the flour. The witness Burkhardt testified that on some unidentified date, the 50 lots of flour were stacked in Tiers 56 and 78, in that portion of the Bienville Street Wharf leased by Central Gulf. Burkhardt did not specify the precise location of the two lots of flour (the UP and the IC car lots) involved in this litigation. Nor did he testify as to the condition of the flour or the warehouse, or any other aspect of defendants' custody of the flour.

### 44.

Defendant Central Gulf, in the summer of 1964, had numerous contracts for the loading at southern ports of the United States and for the ocean transportation of large shipments of flour.

### 45.

Defendant Central Gulf was on notice from the New Orleans Port Authority of their responsibility to protect the flour shipment "from loss or damage from any cause whatsoever, including  *  *  * insects  *  *  *" (Rules and Regulations of the Board of Commissioners of the Port of New Orleans, p. 23.)

### The Government's Damages

### 46.

In September 1964, U.S.D.A. advertised and sold the 1,800 bags of flour on the condition that the flour be used "for other than human consumption." The highest responsive bid was for $1.31 per bag, or for the total price of $2,358. This was a reasonable price.

### 47.

The Government bought the 1,800 bags of flour for $9,372 and salvaged $2,358 on the resale. The Government's out-of-pocket loss was $7,014.

### Findings of Ultimate Facts

### 48.

In the contract between the parties for ocean transportation, time was of the essence, and the contract loading date of June 30, 1964, at the Port of New Orleans was an essential element of the contract.

### 49.

At all times material, defendant Robert H. Wall, Inc., acted as an authorized agent of defendant Central Gulf Steamship Corporation.

### 50.

The entire flour cargo of 44,093 bags of wheat bread flour (of 100 net pounds each) was at the Port of New Orleans and available for lifting by defendants on June 30, 1964. The controversy be-

tween the parties concerns 1,800 bags of the flour which on August 10, 1964, were found to be infested with live insects both outside and inside the bags.

**51.**

Defendants delayed from June 30, 1964, until August 13, 1964, to furnish a vessel to lift the 14,805 bags of flour left behind by the SS GREEN RIDGE. These delays were caused solely by defendants, and in no way were caused by the Government. The delays and their consequences were not excused or waived by the Government.

**52.**

Plaintiff's evidence establishes that both the North Kansas City and Decatur mills employed standard and adequate procedures and took adequate precautions to guard against infestation of the bagged flour shipped from the mills and of the railcars used to transport the flour from the mills to the Port of New Orleans.

**53.**

Immediately prior to the unloading of each railcar at New Orleans, defendant Central Gulf, through its employees, had the opportunity to inspect the car and its contents. Central Gulf had the further opportunity to inspect each bag of flour during the unloading and thereafter. When the unloading was completed, Central Gulf had the opportunity to reinspect the empty railcar. The opportunities were not available to the Government who had no employees or representatives at the Port of New Orleans.

**54.**

By making such inspections, defendants could have, and should have, determined whether car UP–163571 and car IC–29563 and the bags of flour transported therein showed evidence of infestation.

**55.**

In accepting delivery and custody of the 1,800 bags of flour from the UP and the IC cars, Central Gulf signed two sets of receipts. One set of receipts stated that the goods were received "in apparent good order and condition." The second set of receipts contained no qualifying language.

**56.**

Defendants have remained silent as to whether they availed themselves of the opportunities to inspect and observe the railcars and the unloaded bags of flour and, if so, what they learned from the inspections and observations.

**57.**

Defendants also have remained silent with respect to what efforts, if any, they made to inspect, protect and care for the flour from late June, 1964, when they accepted custody, until August 10, 1964, when the 1,800 bags of flour were discovered to be infested.

**58.**

The court finds that defendants' failure to call as witnesses their employees having knowledge of the nature and scope of defendants' inspections and efforts to protect the flour, and their failure to explain the absence of these witnesses, raises the presumption that the testimony of the employees, if called as witnesses, would have been adverse to the interests of defendants.

**59.**

The defendants contend that the fact that an "apparent good order and condition" receipt was given is insufficient to establish that the flour was received in good condition. Gillespie & Co. of New York v. Continental Ins. Co., 14 Misc.2d 110, 176 N.Y.S.2d 146 (N.Y. S.Ct.1958) and M. S. Cowen Co. v. American President Lines, Ltd., 167 F. Supp. 838 (N.D.Cal.1958), cited by defendants do state such a general rule. But these cases are inapposite to the instant case. In both *Gillespie* and *Cowen*, the courts held that the shippers had failed to sustain the burden of proving that the goods were received by the car-

rier in good condition because the delivery receipt showing "apparent" good order and condition was the *only* evidence of such condition. In this case, there is substantial evidence that the flour was in good order and condition when it left the respective mills. The defendants have conceded this much. There is likewise substantial evidence that the railroad cars used to carry the flour to New Orleans were sanitary and insect-free. The court is convinced the preponderance of the evidence shows that the flour in question was in good order and condition when received by Central Gulf in New Orleans.

60.

While the 1,800 bags of flour were in defendants' custody, the flour became infested with insects. Defendants have failed to explain the source of, or the reason for, the infestation.

61.

■ The infestation of said 1,800 bags of flour was proximately caused by defendants' fault, negligence and omission and by the breach of their contractual obligations owing to the Government.

62.

■ By reason of defendants' negligence and breach of contract, plaintiff the United States of America suffered damages of $7,014. None of such damages were caused by, or were due to, any act or omission on the part of plaintiff.

2. Since this is an Admiralty action, "the matter of pre-judgment interest rests within the sound discretion of the trial court." Canova v. Travelers Ins. Co., 406 F.2d 410 (5th Cir. 1969). Cf. Haynes v. Rederi A/S Aladdin, 362 F.2d 345 (5th Cir. 1966); National Marine Service, Inc. v. Talley, 348 F.2d 589 (5th Cir. 1965). The Government's claim arose from cargo damage which occurred in the summer of 1964. The libel in each case was filed on August 2, 1965.

## CONCLUSIONS OF LAW

### 1.

The court has jurisdiction over the parties and the subject matter of these consolidated cases.

### 2.

■ Plaintiff, the United States of America, is entitled to judgment in its favor against defendants Central Gulf Steamship Corporation and Robert H. Wall, Inc., jointly and severally, in the sum of $7,014.00, plus interest from October 23, 1967,[2] at the rate of five (5) per centum per annum and the costs of these actions.

### 3.

The Government will submit an appropriate judgment in accordance with these Findings of Fact and Conclusions of Law.

■

From the record it appears that nearly three years of the delay in bringing this matter to a final judgment was due to the defendants' failure to timely answer interrogatories propounded by the plaintiff. These interrogatories were served in September, 1966, and not finally answered until June 10, 1969. The court feels that the equities of this matter are in favor of the Government and, accordingly, will exercise its discretion in awarding three years' of pre-judgment interest.