**C. ITOH & CO. (AMERICA), INC., et al.**

v.

**M/V HANS LEONHARDT, et al.**

**Civ. A. No. 85–5135–I.**

United States District Court, E.D. Louisiana.

April 12, 1989.

See also 719 F.Supp. 514.

Francis J. Barry, Jr., Warren G. Greenwood, Jr., Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff.

Fred E. Salley, Jack Salley, E. Tucker Gore, New Orleans, La., for defendant.

MENTZ, District Judge.

## MEMORANDUM OPINION

### A. INTRODUCTION

About October 20, 1984, Hellenic Steel Co., S.A., arranged to ship 1343 packages of steel coils and strips weighing 8746.694 metric tons on board the vessel M/V HANS LEONHARDT for delivery at the ports of Chicago, Detroit, and Windsor/Oshawa. The steel coils and strips were wrapped shortly after rolling and stored in a weather protected warehouse, then transported by truck, covered with tarpaulins, and loaded directly onto the M/V HANS LEONHARDT at Thessaloniki, Greece. The bills of lading contained no exceptions.

Arriving at the St. Lawrence Seaway about November 23, 1984, the Captain was advised of a bridge failure at Valley Field, Quebec, and the cargo destined for Windsor and Detroit was discharged at Montre-

al[1] on November 30th thru December 2, 1984. The portion consigned to Pinkert Steel at Chicago remained on board and was transported out the St. Lawrence Seaway, along the Atlantic Coast, to be discharged at New Orleans. About December 15, 1984, the 586 black plate steel sheets in coil were discharged at New Orleans and delivered to American Commercial Barge Line Co. (ACBL), barges ACBL 2719, 1323 and 3010. After loading by the stevedore, T. Smith & Son, Inc. (T. Smith), clean bills of lading were issued. On the way to the Ceres terminal at Chicago, ACBL became aware that barge 1323 had approximately 2800 to 3000 gallons of water in the cargo hopper.[2] As to ACBL 2719 and 3010, some light "salt and pepper" rust was noted upon discharge at Ceres and the damage figure agreed on by Pinkert and the cargo insurers was 10 percent of the 227 non-waterlined coils which were affected (this amounted to 5.8 percent of all 393 non-waterlined coils in the Pinkert shipment).

Discharge began from ACBL 1323 on January 10, 1985. The barge hopper floor was noted to be a bright orange color with ice covering various parts of the floor. Waterlines up to ten inches were noted on the first tier of the coils and a large crack was observed in the hopper. Pinkert Steel rejected all 193 of the "waterlined" or "tidemarked" coils.

The carrier, ACBL, and the owner of ACBL 1323, American Commercial Lines, Inc. (ACL),[3] deny any fault or responsibility for the damage to the steel. Defendants contend that ACBL 1323 was staunch and fit and that the damage to the steel resulted from a combination of causes. Defendants allege that the coils were defectively manufactured and inadequately wrapped and that heavy weather in the Atlantic Ocean exposed the coils to saltwater and promoted sweating and condensation. Defendants assert that T. Smith, rather than themselves, is liable for the damage to the steel. Defendants allege that the thirteen-inch crack in the hopper was due to T. Smith's negligent "drop stowing" of the coils, that T. Smith's rough handling of the coils loosened the covers on the cans and caused rips, gouges, and indentations in the steel, and that T. Smith negligently failed to use dunnage or other pallets and placed the coils directly on the hopper floor. Defendants further contend that additional damage occurred after discharge at Ceres because the coils remained unprocessed at the warehouse for eight months before being sold.

ACBL claims all defenses of the Harter Act, 46 U.S.C.App. § 190–196, namely, the defense of act of God and peril of the sea due to alleged condensation wetting on the trip from New Orleans to Chicago and the defenses of improper packaging and inherent vice. ACL claims that it discharged its obligations to any party by providing three seaworthy barges at the commencement of the voyage. ACBL and ACL further claim that pursuant to the terms of the contract of affreightment, enforceable by virtue of the Pomerene Act, 49 U.S.C.App. § 101, plaintiffs' loading of the barges constituted an acknowledgment that the barges were seaworthy and acceptable for loading and that plaintiffs assumed all responsibility for loading and stowage of the coils. ACBL and ACL have filed third-party complaints for indemnity against T. Smith, the vessel, and the vessel charters. Pursuant to Fed.R.Civ.P. 42(b), these third-party claims were severed from the main demand and stayed pending the resolution of plaintiffs' case.

---

1. Captain Treichel made due "Note of Protest" at Montreal on November 30, 1984, that "during sea passage lashing and securing of the cargo were currently controlled and renewed and tightened whenever necessary. Ventilation, humidity and temperature of cargo holds were carefully watched during voyage.... Should any damage to vessel or cargo have been incurred in spite of all precautionary measures and all care taken, any responsibility is rejected hereby."

2. Also referred to as the "hopper" or "tank top," i.e. the "top" of the double bottom or void separating the exterior hull of the barge from the cargo hopper hull.

3. ACL was the record owner of ACBL 1323, but had bareboat chartered the barge to ACBL.

This action was tried to the Court without a jury on a prior date. At the close of trial, defendants, ACL and ACBL, each moved that an involuntary dismissal be entered in their favor pursuant to Fed.R. Civ.P. 41(b). The Court took defendants' motions under submission. The Court directed the parties to submit post-trial briefs addressing the factual and legal issues raised at trial. Having reviewed the evidence, the briefs submitted by counsel, and the law, the Court now renders its findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a). To the extent any findings of fact are conclusions of law, they are adopted as such; to the extent any conclusions of law are findings of fact, they are so adopted.

## B. GOOD ORDER AND CONDITION IN THESSALONIKI

1. Hellenic Steel Company (Hellenic) of Thessaloniki, Greece, sold 586 coils of cold rolled black plate steel to Pinkert Steel Company of Chicago, Illinois, on a CIF [4] basis pursuant to commercial invoices dated November 1, 1984. The CIF commercial invoice price to Pinkert was $460 per metric ton ($20.87 per hundred weight). C. Itoh & Co. (America), Inc. acted as import "sales/claims agent" for Hellenic.

2. The black plate steel sold to Pinkert was manufactured and rolled in Hellenic's steel plant located on the outskirts of the port of Thessaloniki (approximately 7 kilometers from dockside) during the months of October and November, 1984, under the normal and customary quality control procedures employed by Hellenic.

3. Mr. Zacharias Xiros, Quality Control Manager of Hellenic Steel Company at the time these coils were milled, testified as follows regarding the processing and packaging of the coils. This mill produces cold rolled black plate steel products. The plant was considered to have the most modern equipment in Europe at the time this cargo was shipped. In addition, Hellenic's inspection system was top of the line for European mills. The entire plant is located under one roof. Thus, the steel is protected from the elements at all times.

The processing of the coils is performed in the following manner:

i. Pickling line: The function of the pickling line is to remove rust and scales from the raw material used to manufacture the steel. A quality control inspector examines the raw material as it comes out of the pickling line. If the material is not of sufficient quality for the intended customer when it comes off this line, a distressed material ("DM") ticket is placed on the coil and the coil is re-diverted to another use.

ii. Tandem mill: The tandem mill reduces the thickness of the coils by 75%. The production department looks at one out of every three coils after reduction through the tandem mill (cold reducing mill) to check for rolling marks and other problems with the reduced steel. If indicated, a "DM" ticket is placed on the steel.

iii. Electrolytic cleaning line: The cleaning line removes oil residue from the coils. Light gauge material passes through the electrolytic cleaning line to remove carbon smudges or residual elements left from processing. The operator running the electrolytic cleaning line examines the material as it is cleaned, looking for, among other things, shapes and buckle defects. All coils are checked at this time and defective coils are tagged with a "DM" ticket.

iv. Annealing line: Due to the nature of the operation, the coils are not examined during the annealing process which involves bringing the coils to a very high temperature (650 degrees Celsius) and permitting them to cool slowly. The coils are put in a covered protective atmosphere and heated with burners for approximately 20 hours. The coils are then removed and replaced in a cooling facility.

v. Temper mill: This mill refines the shape and surface texture of the coils. The coils are examined (at high speed) as the material passes through two stands of rollers over which the material is reduced slightly. After tempering, 10 percent of

---

**4.** CIF is the abbreviation for "cost, insurance, and freight." CIF includes the price of the goods, the insurance cost for the goods, and the cost of shipping the goods to the purchaser.

the material is chosen for detailed, close-up inspection by inspectors from the quality control department.

vi. Recoiling line: During the recoiling process, the coil is recoiled for close inspection to determine whether the material is proper for its end use. If a problem is discovered, the inspector places a "DM ticket" on the coil and the coil is re-diverted to another use.

During the recoiling process, the coil may be slit and/or oiled. As per Pinkert's specifications, approximately two-thirds of the coils shipped to Pinkert on the M/V HANS LEONHARDT were dry (not oiled) coils, and approximately one-third of the coils were oiled. All of the coils had a dull finish (30–60 micro inches CLA roughness).[5] The majority of Hellenic Steel's customers order the coils dry and coils are delivered that way without problems, though the chance of rust is reduced with oiled coils.

vii. After recoiling, the coils are packaged for export. Hellenic Steel Company used packaging type No. 1 on all 586 coils ordered by Pinkert Steel. This requires wrapping the coils air-tight with Hellenic's anti-corrosion wrapping paper (paper treated with a vapor corrosive inhibitor) and masking tape. Anti-corrosion paper protects against rust by neutralizing moisture. The coil is then wrapped in a blue metal packaging can. A metallic ring is placed on both outer edges of the center hole of the can/coil. Packaging type No. 1 also calls for a steel ring to be placed around the exterior edge of the can/coil, but this steel ring was not placed on the cans/coils sent to Pinkert.[6] Finally, five metal strapping bands one and one-half inches (1½") wide are placed through the eye and around the can/coil equidistant from each other. Three metal strapping bands one and one-fourth inches (1¼") wide are wrapped around the circumference of the can/coil.

4. The coils which comprised the Pinkert shipment were wrapped inside the Hellenic plant within two days of finishing rolling. The coils were stored in a weather protected warehouse and transported by truck to the port (a distance of approximately 20 minutes by road) for direct loading aboard the vessel. The time between wrapping and transport by trucks to the ocean vessel for loading was one to two weeks. No coils reported to have defects were sent to the M/V HANS LEONHARDT for loading.

5. The weather during loading aboard the M/V HANS LEONHARDT was dry. The steel coils were loaded in apparent good order, being free from visual shape or surface defects, and were issued a clean bill of lading.

## C. OCEAN TRANSIT

6. The ocean vessel M/V HANS LEONHARDT was loaded with the coils destined for Pinkert Steel in Chicago, as well as other coils destined for Namasco Co. and Namasco, Ltd. in Detroit, Michigan, and Windsor, Canada, (a total of 1343 coils) on October 22, 1984, through November 1, 1984.

7. The M/V HANS LEONHARDT sailed from Thessaloniki, Greece, on November 2, 1984. At this point, the Court will refer to several critical areas of the deposition testimony of Captain Uwe Treichel, Master of the M/V HANS LEONHARDT. Before loading the steel coils at Thessaloniki, Greece, the vessel was thoroughly inspected and the holds found "dry, clean, and empty." After the cargo was loaded under the supervision of the ship's officers, all hatches were found to be watertight with steel hatch covers thoroughly wedged. The Captain checked the ventilation to make sure the dew point in the hatches was higher than outside. The Captain rejected some of the coils which had

---

**5.** CLA is an expression of surface roughness indicating the smoothness of the surface of the steel based upon a centerline average.

**6.** The failure to attach this metal ring does not render the packaging unsuitable for shipment.

ASTM A700, which defendants argue is the appropriate packaging for this type of coil, does not have a ring around the exterior edge of the coil.

been damaged by the stevedores during transloading from the trucks to the ship.

8. The M/V HANS LEONHARDT encountered a heavy gale about four hours west of Gibraltar, and the rolling was heavy with a lot of spray water during a sixteen-hour period. Men were sent to inspect each of the cargo hatches. Although there was some water spray in hatch No. 2, there was none in hatch Nos. 1 or 3. Rust stripper was used to prevent rust from growing.

### D. MONTREAL OPERATIONS

9. The M/V HANS LEONHARDT arrived in Montreal, Canada, on November 30, 1984. Because a fallen bridge had closed the St. Lawrence Seaway, thus blocking all traffic to the Great Lakes, the coils destined for consignee Namasco were unloaded at Montreal, stored on the docks in Montreal, and thereafter shipped by truck lines to Detroit and Windsor. At Montreal, some condensation to the coils was noted. The stevedores noted some damage to the coils removed "due to rough seas." Claims regarding damage to the coils unloaded in Montreal and thereafter shipped by road to Detroit and Windsor for delivery to Namasco, were settled by plaintiffs with the ocean carrier interests prior to trial.[7] The surveys (complete with photos) performed on the coils received by Namasco in Detroit and Windsor show that

a tidemark line was found on only one can/coil. *See* Plaintiffs' Exhibit J4, last photo.

10. Due to a damaged bridge on the St. Lawrence, the remaining cargo destined for Chicago was transported to New Orleans. The M/V HANS LEONHARDT departed Montreal on December 2, 1984, sailed out of the St. Lawrence Seaway, and arrived in the port of New Orleans, Louisiana, on December 15, 1984, to discharge the 586 coils destined for Pinkert Steel Company in Chicago. Again, there was heavy weather on the trip to Louisiana, until the vessel passed Cape Hatteras, North Carolina. The Captain stated that there had been no cargo shifting anytime during the entire voyage.

11. Upon arrival in Louisiana, surveyors were waiting and permitted on board after the captain had received permission to open the hatches. Some rust was noted on the tank tops, but no water reported in the hatches. Discharge was by floating cranes into the ACBL barges, and the captain complained of rough handling by the stevedore, T. Smith.[8] The captain denied that it rained in New Orleans during the discharge from the ship to the ACBL barges.

### E. NEW ORLEANS OPERATIONS

12. The three river barges, ACBL 1323, 2719, and 3010, designated to carry the

---

7. An extensive survey of all the coils unloaded at Montreal, Quebec on or about December 15, 1984, was held in late December 1984/early January 1985. There was a general rust condition, ranging from light to heavy rust, on the cans throughout entire shipment. After decanning and unrolling representative coils, condensation (fresh water wetting) could be seen. There was no obvious saltwater drip patterns and no obvious tidemark rust damage. It was generally agreed that the damage was caused by fresh water wetting, a top wetting from within the holds of the vessel, as opposed to a flooding or condensation within the wrappers. Mr. Robin Champness, an independent marine surveyor with Tokio Marine stated that he and his associates "tested all around trying to find salt and we were not successful, we were not able to find salt." Dep. of Mr. Champness, p. 121, ln. 22–24. However, Mr. Champness recognized what appeared to be heavy drip down rust caused by saltwater when shown photographs of some of the cans. He opined that this type of rust would have been caused by saltwater leaking through

the hatches of the vessel. *Id.* at 134, ln. 6. Finally, some of the coils exhibited an incomplete light oil coating which permitted the pinpoint ("salt and pepper") rust from the mill. *Id.* at 174, ln. 14–24. In addition, manufacturing defects in the form of salt and pepper rust were noted. However, most of the damage was the result of water penetration, not manufacturing defects. The mill defects were not rampant through the coils, but only formed a minor speckled rust spotting here and there. Though at least one independent marine surveyor assessed the total damage at five percent of the value of the coils, the parties agreed to a ten percent depreciation in the value of the 225 coils in the shipment and settled all claims for that amount.

8. On December 17, 1984, Captain Treichel filed a Note of Protest as to rough handling of "our steel coil cargo by stevedores, T. Smith, scratched and dented wrapping, broken bands, etc. has been noted."

coils upriver were owned by ACL and were chartered to and operated by ACBL.

13. It is the policy of ACBL to inspect all barges before they are loaded with cargo. Warren Bourgeois, superintendent of barge inspections for ACBL, inspects the hatch covers on the barge hopper to ensure that they close properly, and also inspects the void tanks and the hopper for cracks or fractures.

14. ACBL's inspection of the void tanks consists of taking soundings to determine the amount of water in each void tank. Any amount of water over four to six inches is considered indicative of a possible leak. While inspecting the void tanks, ACBL takes into consideration that the barge is empty and that when the barge is filled with cargo the barge will sit lower because a leak located higher up on the void tank may allow water to enter. ACBL inspects the hopper for cracks using a knife, floodlights, and a flashlight.

15. During the inspection of barge 1323, ACBL personnel found cracks in the hopper. The barge was placed on the "bad order" sheet and sent to Louisiana Dock Company (Louisiana Dock)[9] for repairs.[10] Louisiana Dock's job sheet and the notes of Dewey Dufran, foreman for Louisiana Dock, reflect that on December 14, 1984, among other repairs, thirteen cracks in the boundary of the hopper were welded. The exterior hull of ACBL 1323 was not drydocked for inspection purposes.

16. When a "bad order" hopper arrives at Louisiana Dock for repairs, the company usually has at least two to three welders check the inner hopper floor and walls for cracks, and then welds all cracks that are found. However, on the date in question, December 14, 1984, Mr. Heyward Hill was the only welder who repaired ACBL 1323. Mr. Hill, who was characterized by his employer as a "first class welder," testified that he routinely examines the complete hopper for cracks. Floodlights illuminate the dark hopper of the barge which, Mr. Hill stated, provide "more light than you need really." Nevertheless, hand flashlights are also used by the welders. When inspecting a barge hopper, Mr. Hill first examines the boundary line (the lap all the way around the hopper of the barge) and then checks the floor and the walls. Cracks in the hopper are easily visualized by rust and/or moisture. Mr. Hill uses a chipping hammer and wire brush to check the integrity of each weld. After the job is completed, the foreman inspects the welds to ensure that they are properly repaired. Based on the short amount of time it took to repair the thirteen cracks in the hopper of ACBL 1323, this was a minor repair job. When all repairs indicated on the job sheet are completed, the Louisiana Dock supervisor visually inspects the hopper covers and the void tanks for cracks. Louisiana Dock does not inspect the exterior of the barge unless the time sheet so requests. When the barge repairs are completed, the barge is returned to ACBL, which inspects the barge again to ensure that the barge is clean, dry, and free of cracks.

17. Neither Louisiana Dock nor ACBL perform air tests or hydrostatic tests (water tests) on the barges after hairline cracks are welded. Air testing is performed only on a barge that has sustained substantial damage, such as when a crack opened over a quarter of an inch is repaired. Water testing is not performed because it is difficult to remove the water. These standards conform to the typical shipyard practice in the area. Arthur Sargent, the marine architect, points out that ACBL 1323 sustained periodic cracks in the hopper, sometimes as large as twelve inches (see 12–31–82 repair) prior to the voyage in question. And, subsequent to the voyage, on October 20, 1985, the barge was drydocked to repair a twelve-inch crack in the exterior of the barge. But, considering the evidence as a whole, ACBL 1323's repair record is not notably different from other barges. Also, the Court is not persuaded by plaintiffs' allegation that be-

---

9. Louisiana Dock is an affiliate of ACBL.

10. The other repairs performed on barge ACBL 1323 were:

(1) resetting the number three hopper cover;
(2) repairing the starboard side skirt; and
(3) installing a thirty-five foot wire.

cause ACBL 1323 was used in the scrap metal trade five years prior, in 1980, the internal and general condition of the barge had significantly aged, requiring air or water testing before loading. In contrast, it appears that ACBL 1323 successfully traded in the river barge industry for five years immediately prior to the subject voyage. The Court also finds significant the fact that there were no incidents prior to loading the coils in question which would impose a greater than ordinary degree of care by ACBL in their inspection of the barge. Immediately prior to the carriage of the steel coils in question, ACBL 1323 successfully carried meal, and before that grain, and before that coal, and before that aluminum.

18. Transfer of the 586 coils destined for Pinkert Steel from the M/V HANS LEONHARDT to ACBL barges 2719, 1323, and 3010 was accomplished by T. Smith's crane barges Erin (forward) and Terrence (aft) from 1300 hours to 2100 hours on December 17, 1984, in New Orleans.

19. The subject cargo was discharged over the side of the M/V HANS LEONHARDT directly into the ACBL barges. The stevedore, T. Smith, was hired and paid by Canadian Forest Navigation, Inc. (the time charterer/operator of M/V HANS LEONHARDT) to unload the cargo.

20. The Court finds that there was a fog in New Orleans the morning cargo operations began, but there is nothing in the record to indicate that the fog had any causal relationship to the damage sustained by the coils. Furthermore, there was no evidence of rain or observable water entry into any of the ACBL barges at any time prior to the barge covers being closed by T. Smith and the barges being taken away by ACBL.

21. The chief officer of the M/V HANS LEONHARDT stated that "all cargo was in good order" upon its arrival in New Orleans. When the hatches of the M/V HANS LEONHARDT were opened in New Orleans, surveys were performed by Jeffrey Lawson of Albert R. Lee & Co. (Southern), Inc. (appointed by cargo interests), Dirk Egge of Nautech, Inc. (appointed by vessel's owner's P & I), and Captain Thompson and Mr. Smith of Thompson Marine Surveys, Inc. (appointed by T. Smith, stevedore).

22. The testimony is consistent and uncontradicted from the various surveyors in attendance at New Orleans and from the stevedore crew, as well as from other persons such as the M/V HANS LEONHARDT's captain, that no standing water or waterlined coils were found in the ship's hold during discharge in New Orleans and no waterlined or tidemarked coils were loaded into any of the three ACBL barges during the discharging/loading operations, carried out from 1300 hours to 2100 hours on December 17, 1984.

23. The surveyor appointed by cargo interests, Mr. Jeffrey Lawson of Albert R. Lee & Co. (Southern), Inc., witnessed the unloading of the M/V HANS LEONHARDT and entered holds No. 1 and 2 of the vessel. Mr. Lawson also entered the hoppers of ACBL 1323, 2719, and 3010 after completion of loading.

24. As regards rust damage to the cans/coils in the M/V HANS LEONHARDT, in hold No. 1 Surveyor Lawson saw eleven cans/coils of the Pinkert consignment beneath the air vents, plus six cans/coils aft affected with "heavy splash rust." See photo Nos. 2 and 3 annexed to Mr. Lawson's report. Mr. Lawson also noted general "light drip" rust on the remaining exposed top cans/coils in hold No. 1. Additionally, he observed six cans with coil heads portside aft which showed a drip/splash pattern of oxidation. See Id., photo No. 1. These photographs of hold No. 1 have been placed into evidence and do not reflect the tidemark rust damage later found in Chicago in barge ACBL 1323.

25. In hold No. 2, Jeffrey Lawson saw "light drip or splash rust" on 20 cans/coils stowed in the starboard wing and at the transverse bulkhead. See Id., photo Nos. 5, 6, 7, and 8. These photographs also show no "waterlined" cans/coils in the M/V HANS LEONHARDT at New Orleans.

26. In hold No. 3, Surveyor Lawson saw fourteen cans/coils in the port wing which had "moderate to heavy rust." In addition, ten coils forward showed "moderate to heavy rust in a drip down condition." *See Id.*, photo No. 11. This photograph, when compared to the photographs of very distinct waterlines or tidemarks on the cans/coils coming out of ACBL 1323 in Chicago, confirm the surveyor's testimony that no waterlined coils were found in the M/V HANS LEONHARDT.

27. Mr. Lawson performed silver nitrate tests to determine the source of the splash or dripdown rust found on the cans in the holds of the vessel. These tests confirmed that the rust was caused by saltwater.

28. Surveyor Lawson testified that most of the cans/coils in the vessel which were marked with dripdown rust were found in hold Nos. 1 and 3. The majority of the 225 coils that were loaded into ACBL 1323 were discharged from hold No. 2. Specifically, 137 coils came from hold No. 2 and 88 coils came from hold No. 3.

29. As regards the physical damage to the cans/coils in the vessel, Surveyor Lawson noted that five cans/coils evidenced physical damage during the voyage but that the entire stow was generally in good order. Specifically, in hold No. 2 Lawson found four coils with creased cans caused by a slight shifting of the cargo from their position in the stow. *See Id.*, photo No. 7. Mr. Lawson also observed a fifth coil, No. 40654, with a can adrift and two outer wrappers sprung. *See Id.*, photo No. 6.

30. Surveyor Lawson noted some minor "physical" handling damage during discharge, such as strapping bands broken or a few cans disrupted, but this would have no consequence in regard to Pinkert's claim

for waterlined coils because the "cans" in which the coils were placed were not designed to be watertight, so as to exclude the standing water found later in ACBL 1323 when the barge arrived in Chicago. The Court is of the opinion that the waterline damage represents an intervening cause [11] which would relieve the stevedore of liability.

31. The maximum amount of water Surveyor Lawson saw in the holds of the M/V HANS LEONHARDT was puddled water located on the edges of the vessel floor. Mr. Lawson concluded that these puddles were caused by condensation.

32. Mr. Lawson was informed that after the vessel experienced turbulent weather during the ocean voyage, the master ordered the crewmen to mop dry the cargo. Lawson stated that this mopping, although done with good intentions, "may have resulted in masking the degree of wetting and water penetration, if any, to [the] contents of [the] coils."

33. Plaintiffs' claims in regard to nonwaterline damage to the coils delivered in Chicago were settled with the ocean carrier defendants and no claims are being pursued against ACBL or ACL for such type of rust damage or mill defect.

34. The only water seen in ACBL 1323 in New Orleans was a few scattered, small puddles noted in the shallow indents or depressions in the barge floor. This water was left over from the normal barge washing done at ACBL's premises to clean the barge hopper of residues from prior cargo.[12] To absorb these small puddles, T. Smith spread sawdust on the hopper floor. Nevertheless, Surveyor Lawson noted that ACBL 1323 had "very isolated puddles and a wet floor" during loading. This condition

---

11. "The intervening cause, which will relieve of liability for an injury, is an independent cause which intervenes between the original wrongful act or omission and the injury, turns aside the natural sequence of events, and produces a result which would not otherwise have followed and which could not have been reasonably anticipated. An act of an independent agency which destroys the causal connection between the negligent act of the defendant and the wrongful injury; the independent act being the immediate cause, in which case damages are not recoverable because the original wrongful act is not the proximate cause." Black's Law Dictionary 736 (5th ed.1979).

12. The barges are routinely washed down with high pressure hoses, then dewatered. The hopper floor is then squeezed down and dried. It appears that in this case, there remained some moisture in ACBL 1323.

was also found in ACBL 2719 and 3010. Lawson considered the wet floors to be "of little consequence" but he did observe "a few coils ... placed in puddles which may penetrate to the contents, as shown in photo No. 17" annexed to his report. The Court notes that photograph 17 depicts a can/coil sitting in ½ inch of water in ACBL 2719, but there was no documentation of cans/coils in ACBL 1323 sitting in a puddle of fresh water.

35. Though the M/V HANS LEONHARDT used dunnage (strips of wood) to elevate the coils from the vessel floor, no dunnage was used in barges ACBL 1323, 2719, or 3010. The Court finds based on the vast majority of the witnesses that, in 1984, when this voyage commenced, it was the custom in the Port of New Orleans not to use dunnage in river barges for the transit of steel coils. Because river barges are "double bottomed" or "double skinned," they are considered safe from water leakage or water intrusion.

36. The observations made by other surveyors were consistent with those made by Mr. Lawson. Mr. Donald J. Thompson of Thompson Marine Surveys, Inc. observed the unloading of the M/V HANS LEONHARDT and the loading of the ACBL barges in New Orleans on behalf of T. Smith. Mr. Thompson, a surveyor of twelve years experience, noted that there was light to medium surface rust on the cans/coils and heavy surface rust in localized areas in some of the cans/coils inside the holds of the M/V HANS LEONHARDT, but made no detailed count or observation of how many cans/coils were affected. He did not see any waterlined cans/coils in the vessel. He observed that some of the dunnage on the vessel floor was wet from moisture but saw no puddles of water.

37. Roger Smith, a marine surveyor and consultant with ten years experience, made similar observations of the cargo in the M/V HANS LEONHARDT. He stated that the cans/coils appeared to be in a normal condition, but noted evidence of rust and some sweating in all three holds of the vessel and evidence of light drip-down rust generally on the top tier of the coils.

38. Mr. Smith further testified that though the amount of condensation found in the vessel was unusual, there was no collected condensation on the vessel floor because it was crowned so that moisture ran to the sides of the vessel. The combination of the dunnage and the sloped tank top kept the coils in the vessel from standing in water. Though Mr. Smith did not inspect the dunnage on the ship, he assumed that the dunnage was moist because the slope plates underneath the dunnage were moist.

39. The photographs taken by Roger Smith and his colleague, Captain Thompson, during the cargo operations show barge ACBL 1323 to be dry (with the exception of the moist sawdust on the hopper floor) and loaded with coils without waterlines or tidemarks. Neither Captain Thompson nor Mr. Smith saw any coils with waterlines or tidemarks present in New Orleans. When shown pictures of the coils in barge ACBL 1323 in Chicago, Mr. Smith stated that it was apparent that the barge had become flooded. Mr. Smith defined flooding as any amount of water over one-inch deep and covering an area of ten to fifteen square feet.

40. The time sheet for Barry Bachemin, the stevedoring superintendent for T. Smith who supervised the discharge and loading of coils from the M/V HANS LEONHARDT to the river barges, reflects that he was at the job site continually. Though Mr. Bachemin had no recollection of these coils, he stated that he always made a visual inspection of the barges to ensure that there is no free standing water or defect. He also testified that if a barge has a slight list and a substantial amount of water covering a corner or some portion of the barge, the barge would be rejected. Mr. Bachemin further testified that steel barges are not routinely dry and that puddles on the barge floor are generally absorbed by sawdust. Though dunnage is not used when transporting coils in a river barge, he stated that the workers placed

wooden chalk wedges on the floor of the barge to hold the coils in place.

41. Mr. Archibold Frazer, an independent marine surveyor, observed puddles of water in the vessel caused by "sweating" or condensation, but stated that the amount of condensation in the vessel was normal and that the water would not have come into contact with the steel because the dunnage was three-fourths to one inch thick. In addition, Mr. Frazer saw four coils with their cans completely off (but their wrappers on) being loaded into barge ACBL 1323. Though Mr. Frazer saw puddles one-fourth inch deep in the barges, he did not see the tidemark waterlines found in Chicago on any of the coils in New Orleans.

42. Mr. Dirk Eggie, a marine surveyor, saw puddles of approximately one inch in height at the edge of the barges but stated that most of the water in the barges was absorbed by sawdust and had dissipated by the end of the day.

## F. INLAND BARGE TRANSIT

43. After loading the coils onto the barges, the tow left the M/V HANS LEONHARDT at the Chalmette Slip in St. Bernard Parish, Louisiana, and began its journey up river to Chicago.[13] Before departure, ACBL issued a clean bill of lading for the 225 coils of Pinkert's cargo loaded onto ACBL 1323.

44. The three barges were kept together in the same tow during the movement by ACBL up the Mississippi River. The vessels that pushed the tow were operated by Inland Tugs Company. It is the policy of Inland Tugs Company to check the wires, to exchange rigging, and to check all void spaces on all barges when a tow is exchanged with another vessel. Any indication of a leak in a barge is reported on the company's deck log. A list on a barge would indicate a leak and would result in further inspection. In addition, every void

space is inspected during each change of watch (every six hours).

45. The crew members determine the depth of the water in the void spaces by lowering a five-inch shackle attached to a rope into the void space until it touches the bottom of the barge. Any amount of water over four to five inches is reported to the Captain and then pumped. It is also the company's policy not to tamper with the customer's cargo en route. Thus, hatch covers on the barge hopper are only opened to check for leakage as a last resort.

46. The deck logs of the Inland Tugs vessel utilized by ACBL to move these barges upriver show no indication of any leakage in the barge, that any of the void spaces on any of the barges required pumping, or that any of the barges were listed. The logs, however, indicate that on at least one instance (mile 173 of the Illinois River on 1/5/85) the tow went aground. An inspection by crew members revealed that this was not a serious grounding and that there was no damage to ACBL 1323. All three barges encountered the same weather conditions and arrived at ACBL's barge fleeting and maintenance facility at Lemont, Illinois, on January 7, 1985.

## G. DETERMINING THE SOURCE OF THE WATER IN ACBL 1323

47. It is the policy of ACBL to inspect all incoming ACBL barges. Mr. Mark Smith, the ACBL barge maintenance supervisor on duty that morning, commenced an inspection of the barges at 8:30 a.m. on the morning of their arrival.

48. Mr. Smith noticed a two to three foot list on ACBL 1323. This list had not been reported by any of the tug boats. Upon opening the roll-top hopper cover at the listed end of ACBL 1323, Mr. Smith found an estimated eight inches of water in the port stern corner. The water was a clear (non-murky) orange from the rusty coils. Mr. Smith proceeded to inspect the

13. On December 18, 1988, the three barges were taken from the side of the M/V HANS LEONHARDT by the M/V TACO TOPPY to the ACBL Harahan fleeting facility until a tow was

formed. On the evening of December 19, 1988, the tow was taken up by the M/V E.C. PETERS and commenced its nineteen day voyage to Chicago.

wing tanks which surround the cargo hopper. He found normal water accumulations with the exception of the No. 1 wing tank, wherein he found approximately eighteen inches of green river water.

49. Before proceeding further with his inspection, Mr. Smith told Crestville Marine, Inc., a local barge repair company, to pump the barge. Mr. Smith then reported the damage to Mike Ash with the ACBL claims department. Mike Ash told Mark Smith not to pump the barges until Richard Heiss was able to view the damage. Mr. Ash immediately phoned Mr. Richard Heiss, an independent marine surveyor who routinely handles eighty to ninety percent of the surveys required by ACBL in the Chicago area, and requested that he inspect the barges and their cargo.

50. Approximately thirty minutes later, Mr. Heiss arrived at the ACBL Lemont Slip. He immediately noticed that ACBL 1323 had a significant list to the port stern corner. Heiss took draft readings which affirmed his visual observation that the barge had a significant list. Heiss measured eight feet, two and one-half inches (8' 2½") in the port forward corner; seven feet, seven inches (7' 7") in the starboard forward corner; nine feet, one and one-half inches (9' 1½") in the starboard aft corner, and nine feet, seven inches (9' 7") in the port aft corner. The barge was heaviest at the port stern corner. The bow starboard corner was lighter and higher than the other corners.

51. Both surveyors noted that the rolltop hatch covers were locked and watertight, having no leaks, holes, or cracks. There were no water stains on the tops of the coils or the walls of the hopper evidencing leakage through the covers.

52. A visual inspection of the cargo hopper revealed that the coils in the port stern corner were immersed in orange, rusty water. Measurements of the depth of the water in the hopper were taken. Heiss

estimated that approximately 50, 60 to 75 percent of the hopper floor was covered with water. Mark Smith also stated that the water did not cover the entire hopper floor. Nevertheless, Mark Smith noted patches of ice and rust which indicated that at one time water had covered the entire floor of the hopper. He also noted that the waterlines on the coils gradually became higher as the coils became closer to the stern port corner. Smith estimated that ninety to ninety-five percent of the coils were exposed to the standing water. The Court finds that the following report Heiss submitted soon after his inspection in an accurate and concise summary of amount of water in the inner hopper:

> Examination of the cargo compartment of barge ACBL 1323 disclosed water to be generally extending over the full length of the cargo compartment from bow to stern to an approximate maximum depth of eight inches noted at the port aft corner. Water extended generally over the full width of the cargo compartment aft, though over the forward approximate one quarter of the cargo compartment and particularly along the starboard bulkhead, water was noted only in tank top set downs and/or corrugations to a depth of approximately one-half inch maximum. It appeared, however, that all of the approximately two hundred twenty-five (225) coils of cold rolled steel loaded onboard the subject barge, with the exception of seven (7) second tier coils, had been exposed to the standing water. Water/ice lines found on the coils ranged from a minimum of approximately one quarter inch [14] at the starboard forward corner of the cargo compartment to approximately eight inches maximum noted at the port after corner of the cargo compartment. (See photos Sec. 85–07, Negs. 1–9).

Cargo Damage Survey submitted by Richard Heiss, Plaintiffs' Exhibit R–1, p. 3.

---

**14.** Mr. Heiss's report and a letter dated January 28, 1985, sent to Mike Ash stated that the barge had approximately 2½ inches of water at the starboard forward corner. However, Mr. Heiss testified at trial that there was never 2½ inches of water in the starboard forward corner of the cargo box and that the 2½ inch measurement reflects an error in his compiling and dictating the report.

53. At trial, Heiss stated that there were water and ice lines on some coils which were higher than the waterlines in the corresponding area in the barge, indicating that water had been higher on some sections of the barge than what he reported by measuring the water height in the barge.

54. Mr. Heiss also measured the accumulation of water in the void compartments. He reported the following normal water accumulations:

| Bow compartment | | 4″/water | | |
|---|---|---|---|---|
| # 1 compartment | Port | 1″/water | Starboard | Dry |
| # 2 compartment | Port | Dry | Starboard | Dry |
| # 3 compartment | Port | 4″/water | Starboard | Dry |
| # 4 compartment | Port | 4½″/water | Starboard | Dry |
| # 5 compartment | Port | 4″/water | Starboard | Dry |
| Stern compartment | | 3″/water | | |

*See* Court Exhibit A, attached, for diagram. In contrast to the orange, rusty water in the cargo hopper, the water in the void compartments was greenish and indicative of normal river water.

55. It appears that the pumping operations began *before* Mr. Heiss arrived at the Lamont Slip to inspect ACBL 1323. Mark Smith denied that he pumped any of the water out of ACBL 1323 before the arrival of Mr. Heiss. Mr. Heiss, however, stated at trial and reported in his survey report that the approximately eighteen inches of water in the No. 1 wing tank had been pumped by Mike Ash prior to Heiss' arrival.

56. Richard Heiss and Mark Smith made a detailed inspection of the No. 1 void tank. Each entered the No. 1 void compartment with a knife and a flashlight. Neither surveyor testified that they found a leak in the No. 1 void space.

57. After the water was pumped from ACBL 1323, the cargo unloaded, and the hopper cleaned, Mark Smith and Richard Heiss were able to see cracks in the hopper. They found a crack thirteen inches long and visibly open to the eye located in the port cargo compartment boundary angle/tank top weld seam. The fracture leads to the port bow No. 1 wing tank area. Examination of the hopper after it was cleaned and repaired by Cresthill Marine revealed ten small cracks, but none of these cracks were opened. No amount of water could have entered through these tiny ten cracks. Rather, the area near the cracks would have just been damp. Cresthill Marine found a hairline fracture in the exterior hull located at the nine-foot draft mark in the low starboard corner. Though the fracture could have been below the waterline when the barge was loaded, it was too small to admit water.

58. Mark Smith was unable to determine how the water came into the cargo hopper of ACBL 1323. Richard Heiss also testified at trial that he was unable to determine the cause of the entry of the water. However, in his written report dated January 7, 1985, he set forth the following conclusion regarding the source of the water: "It is the opinion of the undersigned surveyor that the water found in the cargo compartment of barge ACBL 1323 on 1/7/85 probably entered the cargo compartment from the # 1 mid-body compartment through the approximate 13″ fracture of the cargo compartment port boundry angle/tank top noted herein."

59. Mr. Heiss did not conduct diagnostic testing to determine how the water got into the No. 1 mid-body compartment, which in turn leaked into the hopper compartment through the fracture he found. He was not asked by ACBL to make further inquiries or inspections. However, on cross-examination, when Mr. Heiss stated that he was unable to determine how the eighteen inches of water entered the No. 1 mid-body compartment, he acknowledged stating at his deposition that

> [t]here's a variety of means by which [the water] may have entered. It may have been placed there as ballast water to trim the barge or change the attitude of the barge, possibly a tug, a ship, or a towboat may have stripped a holding tank and, because of Coast Guard regulations, et cetera, did not want to pump it directly into the river and found this convenient barge to pump this and it happened to be the No. 1 void compartment.

Depo. of Heiss, p. 127.

60. Naval architect Arthur Sargent, an experienced and reputable marine engineer,

personally inspected ACBL 1323 in August, 1987. After the inspection, and after reviewing various barge plans, survey reports, photographs, barge files, and depositions, Mr. Sargent testified regarding the area where the thirteen-inch fracture was found. The thirteen-inch fracture was located in a weld where the lapped flange of the cargo box side bulkhead meets the tank top. This was reported to be about fifteen feet, six inches aft of the cargo box forward bulkhead. Mr. Sargent also reviewed the repair ticket of Crestville Marine regarding repairs to the ten cracks found in the hopper compartment and the thirteen-inch crack located at the port cargo compartment boundary angle/tank top weld seam.

61. Mr. Sargent was of the opinion that the cargo hopper of ACBL 1323 was not built for a maximum watertight integrity as only one side of the hopper side lap was welded to the hopper bottom. Mr. Sargent added that if a watertight tank compartment was desired, the lap should have been welded continuously at both the heel and the toe of the flanged plate.

62. Extensive testimony was taken from Dr. Dupree Maples, a professor of mechanical engineering at Louisiana State University who was qualified as an expert in thermal and fluid operations, to prove that the 2800 to 3000 gallons of water in ACBL 1323 upon its arrival in Chicago was the result of condensation from the nineteen-day journey upriver. The Court cannot accept the allegation that 2800 to 3000 gallons of water accumulated in the cargo compartment of ACBL 1323 when the two sister barges of similar design and construction arrived in Chicago with their cargo secure.[15] If Dr. Maples' condensation theory were accurate, ACBL 1323 would condense thousands of gallons of water

every trip up the Mississippi River in the winter. The existence of the thirteen-inch crack at the boundary angle between the No. 1 mid-body compartment and the hopper is undisputed and corroborates plaintiffs' version of the incident. The Court finds that the 2800 to 3000 gallons of water entered the hopper through this crack and was not caused by an accumulation of condensation.

63. Assuming *arguendo* that Dr. Maples' condensation theory is correct, the Court accepts the testimony of Arthur Sargent that such a barge is not suitable for the carriage of steel coils upriver in the winter.

64. Plaintiffs suggest that water may have entered the cargo compartment through a hatch cover and dripped down the hopper wall. *See* depo. of Mr. Zeiber. However, Mr. Heiss and Mr. Smith repeatedly stated that the hatch covers were firmly closed and intact upon the barge's arrival in Chicago. Furthermore, there was no evidence that the hatch covers were opened during the voyage upriver. Accordingly, the Court finds that the water in ACBL 1323 did not enter through the hatch covers.

## H. CHICAGO OPERATIONS

65. The wing tank and the cargo compartment of ACBL 1323 were pumped on the morning of January 7, 1985. On January 8, 1985, ACBL 1323, 2719, and 3010 were taken to the Ceres Terminal in Chicago, Illinois, for unloading. The terminal discharged the coils by means of crawler cranes outfitted with coil clamps and forklift trucks outfitted with coil adapters. Discharge operations proceeded at a rate of 35 to 40 coils per hour and took three days to complete.

---

**15.** ACBL 1323 is a typical covered, double-bottomed river hopper barge. It has a rake bow and a square stern. The inner hull of the vessel (the cargo hopper or cargo compartment) is encased in an exterior outer hull. The cargo hopper is surrounded by fifteen mid-body compartments (wing tanks), which extend the full width of the barge.

ACBL 2719 and 3010 are similar in design and construction to ACBL 1323, the only difference

being that ACBL 2719 and 3010 are box barges with slightly smaller apertures (the gap between the high hatch cover and the low hatch cover on the hopper of the barge). ACBL 2719 and 3010 had apertures ¾ inch in height between the barge covers. The apertures on ACBL 1323 were slightly higher, measuring 1-½ to 2 inches. All three barges were built by Jeffboat, Inc.

66. Cargo discharge of ACBL 2719 commenced on January 9, 1985. Mr. Peter Zeiher, representing Tokio Marine Management Cargo interests was the only surveyor present. He "noted some physical damage to the coil wrappers, prior to their being lifted out of the barge." Depo. of Zeiher, p. 22, ln. 16–17. He also observed that the "wrappers showed varying amounts of atmospheric rusting, some evidence of dripdown." *Id.* at ln. 23–24. No additional damage was noted during the discharge of ACBL 2719. ACBL 3010 was discharged on January 11, 1985. No waterline damage was noted on these coils either.

67. Cargo discharge of ACBL 1323 commenced on January 10, 1985, at 8:00 a.m. and was completed at 4:30 p.m. Surveyor Zeiher was joined by Surveyor Richard Heiss of Independent Marine Associates. Though Surveyor Heiss knew that there were serious problems with ACBL 1323, he did not give Surveyor Zeiher any background information on the barge. Discharge operations had not yet commenced when Richard Heiss arrived.

68. Surveyor Heiss looked into the barge prior to opening the hatch covers and saw only residual water in the cargo compartment. Otherwise, the barge was in the same condition as it was at the time of his initial inspection. When the hatch covers on ACBL 1323 were removed, the surveyors observed that the entire hopper floor was a bright orange rust color and exhibited some ice formations.

69. Like the cans/coils in ACBL 2719 and 3010, the cans/coils in ACBL 1323 evidenced atmospheric rusting on all of the cans and dripdown rust patterns on some of the cans. The dripdown rust was caused solely by the conditions aboard the M/V HANS LEONHARDT. However, the cans/coils aboard ACBL 1323 also had distinct waterline damage.

70. All of the bottom tier cans/coils in ACBL 1323 had waterline marks of varying heights from one inch to ten inches caused by sitting in standing water. Seven cans/coils were stowed in the second (top) tier, which were used as "locking coils".

The second tier cans/coils had no perceptible waterlines on them.

71. Surveyor Zeiher, who entered ACBL 1323 to measure the height of the waterlines, noted that the highest waterlines were present in the aft section of the barge. He also observed standing water in the port forward corner.

72. Apart from the rust markings on the cans/coils, Surveyors Heiss and Zeiher observed that some of the cans/coils in all three barges exhibited some physical damage. Both surveyors noted that some of the outer protective cans were shifted, torn, and/or gouged, thus allowing the contents in the can to be exposed. The protective can, which encased each coil, was not watertight. Thus, the can did not have to be damaged for water to seep through the can and into the coil. There was no evidence that the undamaged cans/coils exhibited more severe tidemark damage than the damaged cans/coils.

73. The coils discharged from ACBL 1323, 2719, and 3010 were transferred by crane directly from the barges to a landing area referred to as the hardstand. The weather during discharge was overcast with intermittent, extremely light, snow flurries. It is the practice of Ceres Terminal to clear the hardstand of snow and debris with a front-end loader before the coils are discharged.

74. The coils were carried in the air by forklift truck a distance of fifty yards and set down just inside the doorway of the warehouse. Another forklift truck retrieved the coils and moved them to a location inside the warehouse for storage. It is the practice of Ceres Terminal to remove any snow that accumulates on the top of the cans/coils before placing them in the warehouse.

75. The warehouse provided by Ceres Terminal to store these coils measured two hundred feet square, was made of corrugated steel, was insulated, heated, and had an asphalt floor. The building was not heated while the cargo was being discharged, as several of the large entrances to the warehouse were open. As per the instructions given to Ceres Terminal, the

coils were segregated by bills of lading. It was Ceres' policy to store coils in a pyramid stack. Though Ceres Terminal on occasion placed dunnage underneath the steel coils at its warehouse, dunnage was not used in the case at bar—the coils on the bottom of the pyramid stack were placed directly on the warehouse floor. The waterlined coils were segregated from the non-waterlined coils at a much later date at the request of Pinkert Steel.

76. After the unloading at Ceres Terminal, ACBL 1323 was returned to Cresthill Marine to be cleaned, inspected, and repaired. Repairs were completed on ACBL 1323 on January 11, 1985. After the repairs to ACBL 1323, the barge was used in the grain trade without any complaints of water in the cargo compartment or void spaces.

## I. CARGO DAMAGE SURVEYS/MET-ALLURGICAL ANALYSIS/SALVAGE SALE

77. The first survey of the Pinkert coils was held on February 15, 1985. Subsequent inspections were held on May 9, June 12, and June 21, 1985, at Cox Metal Processing Company in Chicago, Illinois. At each inspection, representative coils were run over a slitting line and recoiled for detailed examination. By the February 15th inspection, Pinkert Steel had rejected all 586 coils that had been unloaded from the three ACBL barges. The sheet surface of the portion of the coils which had been subjected to waterline damage exhibited dark rust staining over the full width of the sheet. Almost every coil exhibited a light speckled or scattered type rust staining generally over the full area of the sheet, referred to as salt and pepper rust. Additionally, some linear streaking was observed.

78. The Court, after reading the numerous depositions introduced at trial and reviewing the testimony of the witnesses who testified at trial, finds that: 1) the water/rust lines noted on the coils in ACBL 1323 were the result of the coils having been exposed to standing water to the approximate level or depth of the waterline;

2) that the linear streaking found on only a few of the coils was caused by a mill defect; and 3) that the speckled, or salt and pepper rust resulted from a mill defect and/or self-sweat (condensation). This linear streaking and salt and pepper rust were also observed on coils unloaded from ACBL 2710 and 3010, and hence were unrelated to the waterline damage. The Court also finds that the salt and pepper rust condition, caused by condensation and/or mill damage, and the linear streaking were insignificant and had little impact on the commercial value of the steel.

79. Mr. Boltz, with the assistance of Mr. Heiss, determined which coils from ACBL 1323 had waterline marks. Mr. Boltz had arrived at a figure of 197 waterlined coils and Mr. Heiss corrected it to 193 coils, a figure then accepted by Mr. Heiss. Defendants now contend that the coils were stored in a manner which did not provide access for accurate inspection to determine the extent of damage to the coils. The Court is of the opinion that any such complaints should have been made contemporaneously with the discharge operations and inspections. Both Mr. Boltz and Mr. Heiss are marine surveyors whose qualifications are well recognized and there is no reason to doubt the accuracy of their figures.

80. It is uncontroverted that the waterlines on the protective cans matched the waterlined condition of the coils inside the cans. Each coil inspected exhibited a distinct waterline, which was slightly shorter than the waterline on the can, and a faint rust line which, when added together, corresponded to the waterline height on the can. Analysis of the waterlined portion of the Pinkert coils immersed in ACBL 1323 revealed that the corrosion was not caused by seawater.

81. It was commercially impracticable to "crop out" the patchy rust sections of the waterlined coils. The waterlines on the coils removed from ACBL 1323 ranged from 1 inch to 10 inches in height. Mr. Richard Chaple, an expert in steel sale and salvage with over forty-three years experience in the business whom the Court found

highly credible, testified that a coil with a waterline two inches high destroys 40 percent of the coil. Dan Newman, a metalurgical engineer who observed the coils at Cox Metals, found that 50 to 60 percent of the total coil surface was affected by stains.

82. "Salt and pepper" is simply a common terminology describing a multitude of faint rust spots in an indefinite pattern. Salt and pepper rust can be caused by the entrapment of moist air during coiling or canning operations at the mill, which over subsequent months, will cause reaction with the steel and the oxidation of the steel surface. Salt and pepper rust can also be a function of the atmosphere that is present within the banded sealed coil of steel. The salt and pepper rust on the coils in ACBL 1323 was imperceptible to the touch and was removable by pickling or other such treatment. Mr. Newman testified that the salt and pepper rust could, in fact, be rubbed off with a pencil eraser.

83. Though Pinkert initally rejected all of the coils in the consignment, Pinkert later accepted all 393 non-waterlined coils. The Court finds that whether the salt and pepper rust affects the value of the coil to consignees depends on the ultimate use of the steel. Though the salt and pepper rust "would be of a great deal of interest to certain ... manufacturers, ... it would be of virtually no interest to other manufacturers." Depo. of Boltz, p. 138, ln. 7–9. Mr. Sinnokrak was of a different opinion, believing that end use manufacturers and processors reject coils affected with salt and pepper rust. *See* depo. of Mr. Sinnokrak, p. 159, ln. 11–17. The Court rejects Mr. Sinnokrak's contention because the weight of the evidence established that salt and pepper rust is often observed on steel coils, that manufacturers routinely purchase such coils for a variety of end uses, and that such condition has little impact on the commercial value of the coil.

84. Mr. Boltz prepared the appropriate salvage sale solicitation letters and sent them to a list of thirty-two potential salvage bidders. By comparing Mr. Boltz' list of potential salvagers to Mr. Fred Garvin's list, it is obvious that the same firms were notified by Mr. Garvin and Mr. Boltz. Boltz' salvage sale of the 193 coils obtained a total of $158,359.77, or $6.26 per hundredweight, which sum was paid to Pinkert Steel.

## J. CONTRIBUTORY NEGLIGENCE AND MITIGATION OF DAMAGE

85. Defendants contend that plaintiffs were contributorily negligent in failing to package and ship the coils in accordance with U.S. Steel practices. Defendants contend that the Pinkert coils should have been packaged and shipped in accordance with the standards of the American Standard Testing Material Society (ASTM). Many of the coils were ordered without oil ("dry"). Defendants argue that all the coils should have been oiled to preserve their condition during the voyage. Defendants have also submitted evidence that tests performed on the wrapping paper reveal no presence of a rust inhibitor within the paper, or a wax or oil to serve as a vapor barrier. Absence of such vapor barrier, oiling, and rust inhibiting chemicals, defendants allege, establishes that the packaging of the coils did not comply with ASTM A700.[16] Additionally, defendants allege that the coils should have been ferro coated and vacuum wrapped and placed on dunnage during shipment.

86. Regarding the packaging of the coils, the clear weight of the evidence reflects that neither the oiling of the coil nor the anti-corrosion paper would have prevented or significantly reduced the severe waterline rust damage sustained by the ACBL 1323 shipment. Defendants have not presented any evidence indicating that waterline rust on the non-oiled coils inspected at Cox Metals was noticably different from the waterline rust on the oiled coils. In fact, there was substantial evidence that the area of the sheet adjacent to the waterline was clean and that these undamaged areas had no oil coating on them at all. *See, e.g.* depo. of Sinnokrak, p.

---

**16.** ASTM A700 represents the practices approved by the American Standard Testing Material Society for the packaging, marketing, and loading of steel products for domestic shipment.

61–62. The Court finds that the oil coating and the anti-corrosion paper would only prevent or diminish the salt and pepper rust. The Court's reduction of the value of the coils by 5.8 percent includes any diminution of value caused by salt and pepper rust.

■ 87. The Court also rejects defendants' contention that the coils should have been ferro coated and vacuum wrapped. Mr. Thomas Watmough, defendants' own expert on the packaging of steel coils was not even familiar with the process called ferro coating. *See* depo. of Watmough, p. 46, ln. 4–9. When asked how these coils should have been packaged, he stated, "... and maybe vacuum wrap would be appropriate, okay, too, for voyages of this length." *Id.* at 45, ln. 16–18. Mr. Sinnokrak testified that ferro coating is usually a green or blue very visible coating and that some people specifically request that it *not* be furnished because it "tends to gum up their machinery when the coil is processed." Depo. of Sinnokrak, p. 63, ln. 14–20. Thus, based on the evidence presented to the Court, the Court finds that processes of ferro coating and vacuum wrapping are not standarized packaging procedures commonly used in the shipment of steel coils. For the reasons set forth above, defendants' arguments regarding packaging have no effect on plaintiffs' award for waterline rust damage.

■ 88. The Court finds that plaintiffs were not contributorily negligent in not ordering dunnage placed under the coils. The testimony by both plaintiff and defendant witnesses, with little exception, was that at the time of the Pinkert shipment, dunnage was customarily not placed under steel cargo for inland barge travel and was not necessary considering that the barge was "double skinned."

■ 89. Defendants also present several mitigation of damages defenses. The Court will respond to each consecutively. Defendants contend that plaintiffs unreasonably failed to dry or remove as much moisture as possible from the waterlined steel. The Court finds defendants' evidence on this point inconclusive. Mr. Sinnokrak, when asked about the feasibility of spraying an oil inhibitor on the coils to reduce further damage, recognized that this would be an expensive process and that the propriety of pursuing this course of action would depend on the costs involved. Because this procedure was not performed, Mr. Sinnokrak "Presume(d) someone was weighing those costs against the actual value of the steel and/or its ultimate diminished value." Depo. of Sinnokrak, p. 88, ln. 1–4. As to whether plaintiffs acted unreasonably in failing to wash down the coils, more specific evidence of the economic feasibility of this procedure is necessary. More importantly, defendants did not adequately explain how the steel would be "dried." When asked about the "drying" process, Mr. Mark Hineman, the only witness who unequivocally stated that these coils should have been dried, responded, "Again, it's starting to get out of my area of expertise." Depo. of Hineman, p. 98, ln. 25, p. 29, ln. 1. Mr. Gavrilovic, simply said, "It's better to dry (the steel) immediately.... It will corrode less than to leave it wet." Depo. of Gavrilovic, p. 43, ln. 5–8. Again, no explanation of how this would be accomplished was given. For all of the foregoing reasons, the Court will not reduce plaintiffs' award for failing to "dry" the steel.

90. Defendants presented insufficient evidence to support their argument that stacking the waterlined coils with the non-waterlined coils affected the condition of the coils. Plaintiffs only claim damages for the 193 waterlined coils removed from ACBL 1323. There was no evidence that stacking clean coils with waterlined coils would further damage the waterlined coils. Defendants' evidence only indicates that if there were water in the waterlined coils, it would have been possible for the water to migrate to the non-waterlined coils.

91. The Court rejects defendants' contention that the cans/coils removed from ACBL 1323 were placed in puddles of water just inside the Ceres warehouse doors. Peter Zeiher, the only witness to observe cans/coils being placed in puddles, noted this only with respect to cargo removed

from ACBL 2719 or 3010. Surveyor Heiss testified that the cans/coils *"may* have been subjected to slight waterline after discharge," but gave no facts to support his conclusion. Finally, Richard Haldane, when shown photographs of cans/coils removed from ACBL 3010 which were allegedly sitting in a large puddle of water, stated that there was moisture on the floor, perhaps from snow which had melted from the treads of the tires on the forklift trucks, but did not observe puddles of water. Thus, the Court finds that though there was wetness in the entrance(s) of the warehouse, the evidence does *not* show that the coils removed from ACBL 1323 were placed in puddles of water which seeped inside the wrappers and damaged the coils.

■ 92. Finally, defendants argue that plaintiffs failed to mitigate their damages by commencing efforts promptly to salvage the steel. Several of defendants' witnesses believe that the condition of the coils deteriorated between January and June of 1985. Defendants also note that on June 6, 1985, Mr. Fred Garvin, representing INC Insurance Company, received high bids on the coils removed from ACBL 1323 from Lombard Metals and Randolph Robinson, "heavy hitters in the secondary steel market." Lombard Metals had a customer who could have used the steel and bid 14.05 cents per pound for salt and pepper damaged coils and 13.26 cents per pound for waterlined coils. Robinson bid 12.11 cents per pound for the salt and pepper damaged coils and 11.11 cents per pound for the waterlined coils. These bids were not firm bids and remained open for only one week. Mr. Garvin, a highly experienced insurance salvager and appraiser, thought these were high bids, but was not surprised at the figures. Mr. Garvin reported the offers to Mr. Smirkie on June 7, 1985, and recommended consummating an immediate sale. After June 7, 1985, the market for steel fluctuated downward. The steel was eventually sold at a price far lower than the June 6, 1985, bids.

93. The Court finds that the Lombard and Robinson bids are entirely too speculative to constitute a reasonable sale price for the coils removed from ACBL 1323. The Court will not measure the sale value of the steel by a nonbinding offer that may never have come to fruition.[17] The evidence showed that Lombard and Robinson never viewed the coils. The only steel company which looked at the steel prior to Mr. Garvin's solicitation was a local company which offered 8 cents per pound for waterlined coils and 11½ cents per pound for the coils which only had salt and pepper damage. Though this bid was significantly lower than Lombard or Robinson's bid, it was also not a firm bid. Furthermore, the package of photographs and information Mr. Garvin sent to prospective bidders inaccurately described the coils as having from four to six inches of waterline. Only Mr. Boltz's solicitation correctly noted that the waterline on the coils ranged from one to ten inches.[18] Furthermore, defendants freely participated in both inspections of the steel after June 6, 1985. Defendants cannot now complain that the steel wasn't sold before they finished their inspections. Accordingly, the Court rejects this mitigation of damages argument. The Court finds that the bids received on July 19, 1985, (the only firm bids received) are an acceptable price for the salvage value of the steel.

### K. DAMAGES

94. Pinkert accepted all 393 non-waterlined coils into their inventory and made

---

**17.** Mr. Chaple, whose forty years in the steel sales/salvage business is to be compared to Mr. Garvin's devotion of "maybe 5%" of his business as an appraiser/salvor of steel products, aptly described the procedure whereby tentative, nonbinding bids will usually be very high for, *inter alia,* the purpose of keeping the bidder's name prominent on the list of firms to be contacted for the "real" sale. Mr. Chaple's testimony carefully explained to the Court why the language used in Mr. Garvin's letter to potential salvors would be interpreted as a mere "sounding of the market," while Mr. Boltz's salvage sale solicitation letter used the appropriate language to indicate to potential salvors that it was asking for binding bids for the "real sale."

**18.** There was evidence that Mr. Boltz measured waterlines of eleven inches rather than ten inches. This minor discrepancy would not effect the the salvage value of the steel.

use of this steel in their normal customer's market. Pinkert made a claim upon their cargo insurer and received a depreciation of 10 percent on 227 of the 393 non-water-lined coils (a total of $71,134.93), which depreciation, if spread over the poundage of all 393 non-waterlined coils, equates to 5.8 percent.[19]

95. The Court finds that any dimunition of value due to salt and pepper rusting or any condition other than the waterline damage is only 5.8 percent of the value of the coil. The 393 non-waterlined coils were transported together with the 193 water-lined coils across the Atlantic and placed in nearly identical river barges in New Orleans. Yet, only the waterlined coils were required to be sold for salvage. Accordingly, the Court will deduct 5.8 percent of the CIF value of the 193 waterlined coils from plaintiffs' award.

96. The damage suffered by Pinkert Steel was the CIF commercial invoice price to Pinkert ($527,950.27), less 5.8 percent for non-waterline damage ($30,621.12), less the proceeds from the salvage sale ($158,-359.77), for a net loss of $338,969.38. The proximate cause of this loss was the waterlining which resulted from the flooded condition of ACBL 1323.

## CONCLUSIONS OF LAW

### A. JURISDICTION

The Court has jurisdiction over this action under the admiralty and maritime laws of the United States and venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1333; F.R.C.P. 9(h); 28 U.S.C. § 1391(b).

### B. THE LEGAL STATUS OF THE PARTIES

Pinkert Steel Company (the owner of the cargo) and The Tokio Marine and Fire Insurance Company, Ltd. (the cargo underwriter) are the proper plaintiffs in interest because they bore the commercial loss resulting from the damaged cargo in ACBL

1323. Tokio Marine and Fire Insurance Company, Ltd. is legally subrogated to Pinkert Steel Company's rights of recovery pursuant to a duly executed subrogation/loan receipt.

Plaintiff, C. Itoh & Company (America), Inc. acted as agent for the cargo shipper, Hellenic Steel Company, in arranging the sale and importation of the cargo in question. C. Itoh & Company (America), Inc. is a named plaintiff herein to avoid any possible gap in title to the goods during the voyage from Thessaloniki, Greece, to Chicago, Illinois.

■ Defendant, ACL, is the owner of ACBL 1323, which was under demise charter to ACBL.

[T]he owner of a vessel under a demise charter is liable [*in personam*] only for unseaworthiness or negligence that pre-exists the charter. This rule recognizes that when the owner of the vessel enters into a demise charter, he surrenders all possession and control of the vessel to the charterer. Since he no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of its ownership. Conversely, the demise charterer "becomes subject to the duties and responsibilities of ownership."

*Kerr–McGee Corp. v. Law*, 479 F.2d 61, 63 (4th Cir.1973) (citations omitted). *See also, Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 96 (5th Cir. 1975), *modified*, 520 F.2d 1104 (5th Cir. 1975); *Dant & Russell v. Dillingham T. & B.*, 1986 A.M.C. 954, 955, 1985 WL 6056. Plaintiffs have not introduced the demise charter into evidence, so the Court is unaware of the date that ACL relinquished control over the barge to ACBL. Nevertheless, there is no evidence that ACBL 1323 was unseaworthy at the beginning of the voyage or that due care was not used to make her seaworthy. *See* infra, section D. 2. Since the barge could have become unseaworthy during the trip upriver and due diligence was used to make her sea-

---

**19.** The 5.8 percent depreciation in the price of the 393 coils equals the amount of the depreciation allowance ($71,134.93) divided by the invoice price of the 393 non-waterlined coils ($1,234,487.75). *See* No. 90 of plaintiffs' proposed findings of fact.

worthy at the beginning of the voyage, plaintiffs have not proven liability on the part of this defendant. Accordingly, the Court will grant ACL's motion for involuntary dismissal.

Defendant, ACBL, a wholly owned subsidiary of ACL, is the issuer of the barge bill of lading and is the carrier responsible for the carriage contract. Consequently, ACBL is liable for any damage to the cargo pursuant to the Harter Act.

### C. THE HARTER ACT

This action is governed by the Harter Act, 46 U.S.C.App. §§ 190 to 196. The Harter Act governs marine transportation of "merchandise or property to or from any port in the United States...." 46 U.S.C. App. § 192. Thus, the bills of lading issued by ACBL were, by law, subject to the Harter Act. The bills of lading incorporate the terms and conditions set forth in the contract of affreightment between Pinkert Steel Company (the shipper) and ACBL (the carrier). Article 18 of said contract of affreightment explicitly provides that "Carrier [ACBL] shall be liable to the extent provided by the common law as modified by the statutes of the United States for any loss of or damage to the shipment herein described." Hence, the Harter Act also applies to the terms and conditions in the contract of affreightment.

Prior to the passage of the Harter Act in 1893, the "common law" governed the marine carriage of goods by common carrier. The common law made the common carrier of goods by water "almost an insurer, being absolutely responsible for the safe arrival of cargo, unless the loss or damage was caused by an act of God or of the public enemy, or by the inherent vice of the goods or the fault of the shipper, and even when the loss was caused by one of these, the carrier had to be free from negligence." *Mississippi Valley Barge Line Co. v. Inland Waterways Shippers Assoc., Inc.,* 289 F.2d 374, 378 (8th Cir.1961), *cert. denied,* 368 U.S. 876, 82 S.Ct. 123, 7 L.Ed.2d 77 (1961).

As bills of lading came into general use, water carriers began inserting onerous and wide ranging exculpatory clauses to escape their common law liability. Eventually the bills included clauses exonerating the carrier from liability for damage caused by the carrier's own negligence. While the British courts generally upheld such negligence exemptions, the United States courts struck them down as against public policy. *Id.* at 379.

Congress responded to this situation by enacting the Harter Act, which regulates the exemptions sought by carriers. The Act protects the cargo interests from onerous exculpatory clauses, while permitting the carriers to avoid liability under certain circumstances. *Mississippi Valley,* 289 F.2d at 379.

Section 1 of the Act prevents the carrier from diminishing in any way its responsibility to properly load, stow, care for, and deliver the cargo.[20] Section 191 precludes the insertion in a bill of lading or shipping document a clause which weakens or avoids the vessel owner, master, agent, or manager's duty to exercise due diligence to make the vessel seaworthy.[21] Finally,

---

20. Section 190 of 46 U.S.C.App. states:

It shall not be lawful for the manager, agent, master, or owner of any vessel transporting merchandise or property from or between ports of the United States and foreign ports to insert in any bill of lading or shipping document any clause, covenant, or agreement whereby it, he, or they shall be relieved from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care, or proper delivery of any and all lawful merchandise or property committed to its or their charge. Any and all words or clauses of such import inserted in bills of lading or shipping receipts shall be null and void and of no effect.

21. Section 191 of 46 U.S.C.App. states:

It shall not be lawful for any vessel transporting merchandise or property from or between ports of the United States of America and foreign ports, her owner, master, agent, or manager, to insert in any bill of lading or shipping document any covenant or agreement whereby the obligations of the owner or owners of said vessel to exercise due diligence [to] properly equip, man, provision, and outfit said vessel, and to make said vessel seaworthy and capable of performing her intended voyage, or whereby the obligations of the master, officers, agents, or servants to carefully handle and stow her cargo

section 3 of the Harter Act, relieves the carrier from the strict common law liability.[22] It allows the carrier to rebut the shipper's prima facie case that the goods were delivered in good condition and were discharged damaged by proving that it used due diligence to make the vessel seaworthy and that the damage was the result of an exception to liability under the Act, such as act of God, peril of the sea, error in the navigation or management of the vessel, improper packaging, or inherent defect in the cargo. The proof of an excepted cause shifts the burden back to the shipper to prove that the carrier negligently cared for the cargo,[23] that the vessel was unseaworthy,[24] or that the carrier did not use due diligence to make the vessel seaworthy. W. Tetley, Marine Cargo Claims 374 (3d ed. 1988); T. Schoenbaum, Admiralty and Maritime Law 338–339 (1987). Where concurrent causes of the loss are possible, the burden returns to the carrier, who has the difficult task of proving the proportion of damage attributable to its own negligence or the vessel's unseaworthiness and the proportion of damage attributable to the excepted cause. If the carrier is unable to segregate the portion of the damage solely attributable to the excepted cause, the carrier must bear the entire loss. *The Vallescura*, 293 U.S. 296, 306, 55 S.Ct. 194, 197, 79 L.Ed. 373 (1934); *United States v. Los Angeles Soap Co.*, 83 F.2d 875, 881–882 (9th Cir.1936); Schoenbaum at 339.

## D. LIABILITY OF ACBL UNDER THE HARTER ACT

### 1. Plaintiffs' prima facie case

■ The shipper proves a prima facie case of liability against the carrier by proving receipt of the cargo by the carrier in good condition and delivery of the cargo in damaged condition. *Mississippi Valley*, 289 F.2d at 377; *Cummins Sales & Service, Inc. v. London and Overseas Ins. Co.*, 476 F.2d 498, 500 (5th Cir.1973), *cert. denied*, 414 U.S. 1003, 94 S.Ct. 359, 38 L.Ed.2d 239 (1973); *Daido Line v. Thomas P. Gonzalez Corp.*, 299 F.2d 669, 671 (9th Cir.1962).

■ The waterline damage to the steel removed from barge ACBL 1323 in Chicago is undisputed. The only issue is whether plaintiffs proved that the steel was in good condition when received by ACBL. A shipper may prove the good condition of the cargo upon receipt by the carrier by showing from the condition of the cargo as delivered that the damage to the goods was caused while in the carrier's custody. Direct evidence that the cargo was in good condition when shipped need not be introduced.[25] *Elia Salzman Tobac-*

---

and to care for and properly deliver same, shall in any wise be lessened, weakened, or avoided.

**22.** Section 192 of 46 U.S.C.App. states:

If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service.

**23.** The carrier has a non-waivable duty to properly load, stow, care for, and deliver the cargo committed to its charge. 46 U.S.C. App. § 190.

**24.** If the shipper proves that the vessel was unseaworthy, the shipper does not have to show a causal relationship between the unseaworthiness and the loss. *The Isis*, 290 U.S. 333, 351, 54 S.Ct. 162, 167, 78 L.Ed. 348 (1933); *The Framlington Court*, 69 F.2d 300, 307 (5th Cir. 1934), *cert. denied*, 292 U.S. 651, 54 S.Ct. 860, 78 L.Ed. 1500 (1934); Tetley at 575.

**25.** The clean bill of lading issued for the cargo in ACBL 1323 is sufficient proof, for purposes of plaintiffs' prima facie case, that there were no tidemarks on the coils when delivered to ACBL. *J. Gerber & Co. v. Holland–Amerika Lijn*, 261 F.Supp. 893, 896 (E.D.La.1966); *Toyomenka v. Truejoy*, 1983 A.M.C. 442, 446. The statement on the bill of lading that "the contents, quality, quantity and condition of the shipment are unknown" does not make the bill of lading unclean. *Amstar v. Naashi*, 1978 A.M.C., 1845, 1848 n. 8.

co Co. v. S.S. Mormacwind, 371 F.2d 537, 539 (2nd Cir.1967).

■ The Court finds that plaintiffs have proved by a preponderance of the evidence that the steel coils loaded aboard barge 1323 were in good condition when delivered to ACBL. Plaintiffs introduced the testimony of Mr. Zacharias Xiros, manager of the Hellenic Steel Company in Thessaloniki, Greece, where these coils were manufactured and packaged for shipment, to establish the good condition of the coils prior to shipment on the M/V HANS LEONHARDT. Mr. Xiros stated that Hellenic was the most modern steel plant in Europe at the time, equipped with state of the art manufacturing equipment. He also testified that strict quality control measures were employed at the plant. The final significant fact set forth by Mr. Xiros was that the coils were stored in a weather protected warehouse until picked up by truck for direct loading onto the vessel.

Plaintiffs then introduced the deposition of Captain Uwe Treichel, Master of the M/V HANS LEONHARDT, to trace the movement of the M/V HANS LEONHARDT from Greece to Montreal, Canada, where coils that were part of another consignment were unloaded. Due to rough weather crossing the Atlantic, the cans unloaded at Montreal exhibited light to heavy patchy drip down rust caused by saltwater. However, there was no saltwater damage to the coils. After decanning and unrolling representative coils, only minor condensation caused by a fresh water wetting was present. Some of the steel also exhibited an occasional salt and pepper rust caused by a mill defect and/or atmospheric conditions. A tidemark line was found on only one can.

Plaintiffs then tracked the M/V HANS LEONHARDT from Montreal to New Orleans. Captain Treichel testified that the vessel encountered rough weather until the vessel passed Cape Hatteras, North Carolina, but there was no shifting of the cargo in transit. Upon arrival in New Orleans, the holds of the vessel were inspected. Though some rust was noted on the tank top of the vessel, there was no water in the hatches and no tidemark lines on the cargo. The good order of the cargo in the holds of the vessel was established by eye witness testimony and numerous photographs. Plaintiffs also established that it did not rain at any time while the cargo was being transferred from the vessel into ACBL 1323.

The coils were not unrolled at New Orleans for internal inspection. The testimony reflects that it is impracticable timewise and prohibitively costly to uncoil representative coils for inspection. Moreover, there was no damage to the cans which would warrant an internal inspection. Nevertheless, plaintiffs proved that the coils were in good condition when placed aboard ACBL 1323 by the foregoing evidence of the manufacturing, packaging, and shipment of the coils and by the condition of the coils at outturn. Plaintiffs proved that except for the waterline rust marks, the steel which was unrolled for inspection in Chicago was close to prime steel which had a significant commercial value. The minor salt and pepper rust and intermittent linear streaking had little effect on the commercial value of the steel. Such steel is "clean" steel and the salt and pepper rust is removable with pickling treatment. Based on the foregoing, plaintiffs have proved a prima facie case of good order and condition upon receipt by ACBL.[26]

26. ACBL contends that the Pinkert coils suffered "inherent vices such as inadequate packaging, mill defects, a lack of protective oil or ferro-coating on surfaces, and a condition known as salt and pepper rust." Relying on a line of 2nd Circuit cases, ACBL alleges that plaintiffs must disprove the inherent vices as part of its showing that the steel cargo was in good condition upon delivery to ACBL. See e.g. American Tobacco Co. v. Goulandris, 281 F.2d 179, 182 (2nd Cir.1960); The Niel Maersk, 91 F.2d 932 (2nd Cir.1937), cert. denied, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582 (1937); United States Steel Int'l, Inc. v. Granheim, 540 F.Supp. 1326, 1332 (S.D.N.Y.1982).

The Court is not required to address this issue because plaintiffs have so thoroughly documented their prima facie case, proving the adequacy of the packaging and the actual condition of the steel. However, the Court notes that the Fifth Circuit, while requiring the shipper to prove the undamaged condition of the cargo, does not

## 2. The Carrier's burden of proof—Due diligence to make the vessel seaworthy

Once the prima facie case is established, the burden of proof shifts to the carrier to bring itself within one of the exceptions listed in the Act which would relieve the carrier of its liability. However, to be entitled to the exceptions to liability, the carrier must establish that it used due care to guard against it. *The Vallescura,* 293 U.S. at 303, 55 S.Ct. at 196; Tetley at 372. This is shown by proving that the carrier exercised due diligence to make the vessel seaworthy at the beginning of the voyage.[27]

The test of seaworthiness is whether the vessel is reasonably fit to carry the cargo which she has undertaken to transport. *The Silvia,* 171 U.S. 462, 19 S.Ct. 7, 43 L.Ed. 241 (1898). Absolute seaworthiness is not required, however, nor, in fact, is any seaworthiness. Tetley at 371. Rather, the carrier is only obligated to exercise due diligence to tender seaworthy vessel. Due diligence is

[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent man under the particular circumstances; not measured by any absolute standard, but depending on the relative facts of the special case.[28]

It is therefore incumbent on ACBL to show that a due and proper inspection had been had and that a reasonable effort was made to furnish a vessel of the proper design, structure, and equipment for the carriage of plaintiffs' cargo.

The Court finds that ACBL exercised due diligence to make ACBL 1323 seaworthy for her voyage to Chicago. ACBL and its Louisiana Dock affiliate made careful visual examinations of the barge and repaired all known cracks. In so doing they followed the standard procedures employed in the Port of New Orleans to examine and repair river barges. None of the thirteen cracks that were repaired were large enough to require air testing and were considered only minor repairs. ACBL 1323 had successfully carried a cargo of meal immediately before the inspection and there were no facts to warrant heightened scrutiny of this particular barge. The Court is not persuaded by plaintiffs' argument that air testing was required because of ACBL 1323's repair history. Accordingly, ACBL exercised due diligence to tender a seaworthy vessel in that it acted in a reasonable and prudent manner in inspecting and repairing the barge.

A carrier does not exercise due diligence under the Harter Act merely by diligently inspecting the condition of the vessel. The carrier must also furnish a vessel which is properly designed and equipped to carry the specified cargo. *See Int'l Navigation Co. v. Farr & Bailey Mfg. Co.,* 181 U.S. 218, 225, 21 S.Ct. 591, 593, 45 L.Ed. 830 (1901). The Court finds

---

also require the plaintiff to disprove the existence of an inherent vice as part of its prima facie case. *See Socony Mobil Oil Co., Inc. v. Texas Coastal and Int'l, Inc.,* 559 F.2d 1008, 1013 (5th Cir.1977); *Quaker Oats Co. v. M/V TORVANGER* 734 F.2d 238, 241 n. 3 (5th Cir.1984), *cert. denied,* 469 U.S. 1189, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985); *Harbert Int'l, Establishment v. Power Shipping,* 635 F.2d 370, 375 (5th Cir. 1981); *Shell Oil Co. v. M/T GILDA,* 790 F.2d 1209, 1213 (5th Cir.1986). *See generally,* Schoenbaum, p. 358. Though these cases arise under The Carriage of Goods by Sea Act (COGSA), 46 U.S.C.App. § 1300 *et seq.,* the burden of proof under the Harter Act and COGSA is almost identical. *Schoenbaum,* p. 317–318. Further, this view is not inconsistent with the Fifth Circuit's interpretation of the Harter Act. *See Compagnie de Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.,* 316 F.2d 163, 170 (5th Cir.1973); *United States v. Central Gulf S.S. Corp.,* 321 F.Supp. 945 (E.D.La.1970) *aff'd.* 456 F.2d 1281 (5th Cir.1972); *United States v. Lykes Brothers S.S. Co., Inc.,* 511 F.2d 218 (5th Cir.1975).

**27.** Section 191 of the Harter Act requires the carrier to "exercise due diligence to properly equip, man, provision, and outfit [the] vessel, and to make [the] vessel seaworthy and capable of performing her intended voyage...." Though the issue has not been clearly addressed by the courts, this Court finds that the carrier must prove the exercise of due diligence to make the ship seaworthy before proving one of the exculpatory exceptions. Tetley at 372 (citations omitted); *Cf. The Wildcroft,* 201 U.S. 378, 386, 26 S.Ct. 467, 468, 50 L.Ed. 794 (1906).

**28.** Black's Law Dictionary 411 (5th ed. 1979).

that ACBL used due diligence to provide a barge which was sufficiently designed and equipped for the carriage of steel coils upriver. ACBL 1323 was a standard river barge, identical to its sister barges, ACBL 2719 and 3010, both of which were in the same tow and carried identical steel coils, yet arrived in Chicago without taking on thousands of gallons of water and causing waterline damage to the coils. There was extensive testimony that ACBL 1323 was typical of the barges used to carry steel coils in the Mississippi River. Therefore, the Court also finds that ACBL used due diligence to provide a vessel that was properly designed to transport these steel coils to Chicago.

### 3. Exceptions to Liability

Since ACBL used due diligence to tender a seaworthy vessel, it is not responsible for damage or loss resulting from one of the excepted causes in section 3 of the Harter Act, such as act of God, peril of the sea, error in navigation, insufficient packaging, or inherent defect in the goods shipped.

ACBL contends that the 3000 gallons of water found in ACBL 1323 resulted from an act of God or peril of the sea.[29] An act of God is "an act, event, happening, or occurrence due to natural causes and inevitable accident...."[30] Similarily, a peril of the sea is "some catastrophic force or event that would not be expected in the area of the voyage, at that time of the year and that could not be reasonably guarded against."[31]

It is apparent to the Court, based on the arrival in Chicago of the two sister barges, ACBL 2719 and 3010, with dry hoppers, that this accident was not inevitable and could have been guarded against. All three barges were standard river barges of similar design. All three were carried upriver in one integrated tow and, thus, encountered identical weather conditions. There is simply no basis for ACBL's contention that the water in ACBL 1323 was a "collection of condensation" caused by an act of God or peril of the sea. Rather, the Court finds that ACBL 1323 was unseaworthy and that the 3000 gallons of water entered the hopper of the barge from the No. 1 void tank through the thirteen-inch crack in the hopper. ACBL disputes this conclusion, and claims that water could not have entered through this crack. Even if the Court were to agree that water could not have entered the hopper in this manner, we nevertheless reject defendant's condensation theory. That would leave no explanation for the source of the water. However, as explained in *The Folmina*, 212 U.S. 354, 29 S.Ct. 363, 53 L.Ed. 546 (1909), ACBL would nevertheless be unable to come within the exception of act of God or peril of the sea:

> [P]roof merely of damage to cargo by sea water does not necessarily tend to establish that such damage was caused by a peril or danger of the seas.
>
> \*　\*　\*　\*　\*　\*
>
> The inability of the court below to determine the cause of the entrance of the sea water would imply that the evidence did not disclose in any manner how the sea water came into the ship. In other words, while there was a certainty from the proof of a damage by sea water, there was a failure of the proof to determine whether the presence of the sea water in the ship was occasioned by an accident of the sea, by negligence, or by any other cause. Manifestly, however, the presence of the sea water must have resulted from some cause, and it would be mere conjecture to assume simply from the fact that damage was done by sea water that therefore it was occasioned by a peril of the sea. As the burden of showing that the damage arose from one of the excepted causes

---

**29.** The Court assumes that ACBL is not asserting an error in navigation exception to the Harter Act. ACBL introduced evidence that Inland Tugs Company properly managed and regularly inspected the void tanks on ACBL 1323 on its journey from New Orleans to Chicago. ACBL also put on evidence that the grounding of ACBL 1323 did not cause any damage to the barge.

**30.** Blacks Law Dictionary 31 (5th ed.1979).

**31.** Tetley at 432.

was upon the carrier, and the evidence, although establishing the damage, left its efficient cause wholly unascertained, it follows that the doubt as to the cause of the entrance of the sea water must be resolved against the carrier.

*Id.* 212 U.S. at 362–63, 29 S.Ct. at 365 (citations omitted).

■ ACBL also asserts the defenses of inherent vice[32] and insufficiency of package. ACBL maintains that the steel was not prime steel at the time of its manufacture, nor at the time of loading aboard ACBL 1323 in New Orleans. ACBL believes that the steel had suffered substantial diminutions in its claimed value as a result of improper rolling, inadequate oiling, and improper wrapping at the Hellenic Steel plant in Greece.

■ To bring itself within an exception to the Harter Act, ACBL must prove the exception and show that the exception was the cause of the loss.[33] Though there was evidence that the Pinkert steel sustained salt and pepper rust caused by a mill defect and/or condensation and had intermittent linear streakings caused by a mill defect, there was no causal relationship between these defects and the waterline rust marks. The evidence also established that the packaging methods advocated by defendants would not have prevented the waterline rust found on the coils. Furthermore, the Court finds the packaging of these coils was adequate. In determining whether packaging is insufficient, the courts have generally applied a rule of reason which weighs the cost of alternative methods of shipping cargo against the likelihood that they will avoid the damage incurred. *Alcan Rubber v. Hellenic Leader,* 1978 A.M.C. 63, 70; Tetley at 499. Though heavier oiling of the steel can reasonably have been expected of the shipper and would have provided greater protection against salt and pepper rust, the Court recognizes that the carrier is not liable for normal atmospheric damage to the coils. ACBL's evidence on these points affects the quantum of damages plaintiffs are entitled to receive. The burden of proof and presumptions of liability set forth in the Harter Act determine which party is liable for damage complained of. Absent a causal connection between the Harter Act exception to liability and the damage alleged in the complaint, the exception, even if proven, does not shift the burden of proof back to the shipper. In all of the cases reviewed by the Court where a Harter Act exception was proven by the carrier, the exception caused the damage in question. *See* note 33, supra. ACBL has not cited any authority for exonerating a carrier from liability where the excepted cause did not result in the damage at issue.

### 4. Exculpatory Clauses

ACBL alleges that pursuant to the terms of the contract of affreightment, the shippers were responsible for the proper loading and stowage of the steel coils onto the ACBL barges.[34] The transfer of the steel

---

**32.** An inherent vice is "'any existing defects, diseases, decay or the inherent nature of the commodity which will cause it to deteriorate with a lapse of time.'" Tetley at 480 (quoting *Missouri Pacific R.R. Co. v. Elmore & Stahl,* 377 U.S. 134, 139, 84 S.Ct. 1142, 1145, 12 L.Ed.2d 194 (1964).

**33.** Cf. *The Isis,* 290 U.S. at 351; 54 S.Ct. at 167 (a causal relationship between the defect and the disaster is required under the Harter Act except where the vessel is unseaworthy); *Philip Morris v. American Shipping Co., Inc.,* 748 F.2d 563, 566 (11th Cir.1984) (the carrier must prove that the loss or damage falls within one of the COGSA exceptions...."); Schoenbaum at 338 (the carrier must prove that "the harm was occasioned by one of the excepted causes...."); *A. & P. Tea Co. v. Brasileiro Patrimonio Nacional,* 1963

A.M.C. 443, 445 ("in the absence of a showing that the loss was due to 'insufficiency of packing,' plaintiff need not come forward with any evidence showing that the bags were sufficiently or adequately packed in order to establish its prima facie case...."); Restatement (Second) of Torts, § 432, comment b (1981) ("where the actor's tortious conduct consists in a failure to take some precautions which are required for the protection of another's ... chattels ... if the same harm, both in character and extent, would have been sustained even had the actor taken the required precautions, his failure to do so is not even a perceptible factor in bringing it about [and is not the cause of the damage.])"

**34.** Paragraph 12 of the contract of affreightment provides in part that "[p]roper loading and unloading of cargo shall be Shipper's responsibili-

coils was carried out by stevedores employed by cargo interests. ACBL maintains that the thirteen-inch crack in the boundary angle of the barge which was discovered at Chicago was caused by "drop stowing" the steel into the barge. The contract of affreightment, ACBL asserts, only required ACBL to ensure that the barges were seaworthy at the commencement of the voyage and to spot the transloading of the coils from the M/V HANS LEONHARDT onto the ACBL barges. ACBL also contends that the stevedores were negligent in failing to place the water-sensitive steel on proper dunnage. Four-inch wood dunnage, ACBL believes, would have prevented fifty-seven of the coils from waterline stains and, hence, would have significantly reduced plaintiffs' damages. ACBL maintains that since it is not responsible for the stevedore's failure to properly load and stow the coils, any recovery against defendants should be reduced by the value of these fifty-seven coils.

Finally, ACBL argues that the contract of affreightment required the shipper to inspect the barges before loading to determine whether they were suitable for the carriage of steel coils.[35] ACBL asserts that by loading, "[s]hippers accepted the barges and are now barred from raising issues as to the suitability and seaworthiness of the barges. This bar also includes issues as to the appropriateness of any form of ventilation that does or does not exist on the barges." *See* ACBL's proposed conclusion of law No. 10.

The Harter Act makes null and void and of no effect all words or clauses in a bill of lading which purport to relieve the carrier from loss or damage arising from its duty to properly load, stow, and care for the cargo and to use due diligence to make the vessel seaworthy. 46 U.S.C.App. §§ 190, 191, *see* note 20 and 21, supra, for text. Therefore, these conditions in the contract of affreightment are patently in violation of the carrier's statutory duties under the Harter Act.[36] Nevertheless, ACBL maintains that these clauses are "shipper's weight, load, and count" provisions which are valid under section 21 of the Pomerene Act, 49 U.S.C.App. §§ 81, *et seq.*, 101[37] and apply to a Harter Act bill of

ty and shall be accomplished by Shipper at its sole expense." In addition, the bills of lading provide that "[u]nless otherwise indicated by endorsement hereon, the said shipment has been loaded by the Shipper and the contents, quality, quantity and condition of the shipment are unknown."

35. Paragraph 15 of the contract of affreightment provides in part that "Carrier shall tender barges which are in a condition suitable for the cargo to be carried. Loading of the barges shall constitute Shipper's acceptance of the condition and suitability of the barges for the intended cargo."

36. *See Mississippi Valley*, 289 F.2d at 374, for an excellent discussion of these exculpatory clauses in a Harter Act bill of lading.

37. 49 U.S.C.App. § 101 provides that:
When package freight or bulk freight is loaded by a shipper and the goods are described in a bill of lading merely by a statement of marks or labels upon them or upon packages containing them, or by a statement that the goods are said to be goods of a certain kind or quantity, or in a certain condition, or it is stated in the bill of lading that packages are said to contain goods of a certain kind or quantity or in a certain condition, or that the contents or condition of the contents of packages are unknown, or words of like purport are contained in the bill of lading, such statements, if true, shall not make liable the carrier issuing the bill of lading, although the goods are not of the kind or quantity or in the condition which the marks or labels upon them indicate, or of the kind or quantity or in the condition they were said to be by the consignor. The carrier may also by inserting in the bill of lading the words "Shipper's weight, load, and count," or other words of like purport, indicate that the goods were loaded by the shipper and the description of them made by him; and if such statement be true, the carrier shall not be liable for damages caused by the improper loading or by the nonreceipt or by the misdescription of the goods described in the bill of lading: Provided, however, Where the shipper of bulk freight installs and maintains adequate facilities for weighing such freight, and the same are available to the carrier, then the carrier, upon written request of such shipper and when given a reasonable opportunity so to do, shall ascertain the kind and quantity of bulk freight within a reasonable time after such written request, and the carriers shall not in such cases insert in the bill of lading the words "Shipper's weight," or other words of like purport, and if so inserted contrary to the provisions of this section, said words shall be treated as null and void and as if not inserted therein.

**508**

lading and contract of affreightment. *See Mitsui & Co. v. M/V EASTERN TREAS-URE*, 466 F.Supp. 391, 395 (E.D.La.1979).

 The Court finds no merit in ACBL's argument. Section 21 of the Pomerene Act applies to bills of lading for package freight or bulk freight loaded by the shipper. It allows the carrier to place on the shipper the burden of proving the actual number, weight, or type of goods loaded onto a vessel since bulk packaging prevents the carrier from inspecting the goods and noting these exceptions on the bill of lading. The notation "shipper's weight, load and count" simply puts the burden on the shipper to prove the amount that was shipped. *Dwinnell v. Duluth, S.S. & A.R. Co.*, 242 Mich. 357, 218 N.W. 649 (1928). It does not affect the liability of the carrier for damage to any goods actually delivered to and accepted by it for carriage. *Id.*

Judge Cassibry, the author of the *Mitsui* decision upon which ACBL relies, recognized that "the carrier could not relieve itself of its legal duty [under the Harter Act] to handle and stow the cargo carefully, [a 'shipper's weight, load, and count' provision] notwithstanding." *Id.* at 394 (citing *Mississippi Valley*, 289 F.2d at 374. Accordingly, he clearly stated that "[t]he issue before the court in the instant case is much narrower, for it concerns merely how the 'Shipper's weight, load, and count' clause affects the burden of proof on the factual issue of *how much* cargo the carrier took on board." *Mitsui* at 394 (emphasis added).

Judge Cassibry found section 21 of the Pomerene Act consistent with the Harter Act, which expressly allows a carrier to indicate in its bill of lading that the shipper weighed the cargo, although that phrase had no effect on the prima facie effect of the bill.[38] *Mitsui* at 395 (citing 46 U.S.C. App. § 193). Since the Pomerene Act was passed after the Harter Act, the Court found that Congress intended for section

21 of the Pomerene Act to modify the legal effect that bills of lading would otherwise have under the Harter Act. *Id. Mitsui* does not stand for the proposition that a "shipper's weight, load, and count" clause relieves the carrier from its obligations under the Harter Act to properly load and stow the cargo and to provide a seaworthy vessel. Proof of this can be found in a subsequent opinion written by Judge Cassibry, *Delta Steel, Inc. v. M/S PANAGOS D. PATERAS*, 548 F.Supp. 1006 (E.D.La. 1982), which the Court found while performing independent research on this issue. Like ACBL, the carrier in *Delta Steel* argued that section 1 of the Harter Act, which imposes liability on a carrier for damage arising from negligent care of the cargo entrusted to it, does not apply because the terms of the bill of lading place responsibility for loading and discharging the cargo on the freight forwarder, not on the carrier. In response, Judge Cassibry wrote:

[I]t is the carrier [Riverway Barge Company] that has the non-delegable duty of properly and carefully loading, handling, stowing, carrying, keeping, caring for, and discharging the goods carried.

Therefore, any of the provisions in the Riverway Barge Company bill of lading which attempts to exculpate Riverway Barge Company for negligence, fault, or failure in proper loading, stowage, custody, care or delivery of the cargo in question is void and of no effect.

*Id.* at 1011–1012 (citations omitted).

The other cases involving a "shipper's weight, load, and count" bill of lading upon which ACBL relies to escape liability involve railroad carriers, which are governed by the rules of interstate commerce. *See Dublin Co. v. Ryder Truck Lines, Inc.*, 417 F.2d 777 (5th Cir.1969); *Modern Tool Corp. v. Pennsylvania R.R. Co.*, 100 F.Supp. 595 (N.J.1951). As such, they are of no persuasive authority to the Court. Without question, the stipulations found in ACBL's bills of lading violate the prohibi-

**38.** *See* 46 U.S.C.App. § 193. The Court notes that section 21 of the Pomerene Act does not modify section 4 of the Harter Act, which requires the carrier "to issue to shippers ... a bill of lading ... stating ... the apparent order or condition" of the cargo and provides that "such document shall be prima facie evidence of the receipt of the merchandise therein described."

tions of the Harter Act. Like COGSA, the Harter Act "allows a freedom of contracting out of its terms, but only in the direction of *increasing* the [carrier and] shipowner's liabilities, and never in the direction of diminishing them." *Cf. Portland Fish Co. v. States S.S. Co.*, 510 F.2d 628, 632 (9th Cir.1974). In the Court's opinion, the exculpatory clauses as interpreted by ACBL are not "shipper's weight, load, and count" clauses. Rather, they are "it's shipper's responsibility to load and determine whether the vessel is seaworthy" clauses. Such provisions are invalid under the Harter Act. Accordingly, for all of the foregoing reasons, the Court finds that ACBL has not borne the burden of bringing itself within any defense or exemption provided by the Harter Act and is liable to plaintiffs for the waterlining which resulted from the flooded condition of ACBL 1323.

### E. DAMAGES

The general rule for assessing damages for injury to cargo while in the possession of the carrier is the difference between the market value of sound goods at the port of destination and the market value of the goods in damaged condition.[39] *Holden v. S/S Kendall Fish*, 262 F.Supp. 862, 864 (E.D.La.1966), *aff'd.*, 395 F.2d 910 (5th Cir.1968).

Market value, however, is only one method of ascertaining the loss to the shipper. It may be discarded where more accurate means are available. *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461, 465 (S.D.Ga.1975), *aff'd*, 525 F.2d 691 (5th Cir.1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976); *Interstate Steel Corp. v. S.S. "CRYSTAL GEM,"* 317 F.Supp. 112, 121 (S.D.N.Y. 1970). "The assessment of damages in particular situations has called for the development of lesser rules, the use of common sense and the creation of exceptions,

all to the end that the shipper whose property has been affected be made whole." *Santiago v. Sea–Land Service, Inc.*, 366 F.Supp. 1309, 1314 (P.R.1973). Thus, the primary object in awarding damages is to indemnify plaintiff for the amount of damage actually sustained. *Interstate Steel*, 317 F.Supp. at 121.

Plaintiffs argue for damages based on the actual invoice price to Pinkert, less the salvage proceeds obtained by the salvage sale conducted by John Boltz of Inland Surveyors, Inc. ACBL contends that the non-waterlined coils had been reduced to secondary steel because of salt and pepper rust, condensation wetting, and other physical defects and that the salvage bids gathered by Fred Garvin of INA Insurance Company accurately reflect the market value of the goods at destination. The market price for secondary steel fell significantly between April and August, 1985. ACBL argues that had Garvin been authorized to consummate the sale to Lombard Metals based on the original, non-biding bids, the reduction in value of the coils would have been significantly less.

The Court finds that the appropriate measure of damages in this case is the invoice price, less 5.8 percent[40] of the invoice value of the coils for non-waterline related damage, less the salvage proceeds obtained at the salvage sale conducted by John Boltz. The Court concludes that this is the most accurate means of computing the amount of damage actually sustained by plaintiffs. Plaintiffs received the invoice value of the steel less 5.8 percent as compensation for the non-waterline damage sustained by the coils in ACBL 2719 and 3010. Had the coils in ACBL 1323 been free from tidemarks, plaintiffs would probably have received the same 5.8 percent reduction on these coils.

The Court refuses to measure plaintiffs damage by Lombard Metal's unfirm bid on the coils. This standard is entirely too

---

**39.** Where the goods are lost in their entirety, rather than damaged, the measure of damages is the market value of sound goods at the port of destination. *Santiago v. Sea–Land Service, Inc.*, 366 F.Supp. 1309, 1314 (P.R.1973) (citing

*St. Johns N.F. Shipping Corp. v. S.A. Compahnia Geral Commercial DO Rio de Janeiro*, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923)).

**40.** See note 19, supra.

speculative. Neither will the Court measure plaintiff's damages by the secondary steel market as defendants urge. Secondary steel comprises a wide range of damaged steel and, hence, reflects an evaluation that is too low for these coils. Further, though the non-waterlined Pinkert coils were not undamaged, they were closer to prime steel than secondary steel and had a significant commercial value. Clearly, the 5.8 percent depreciation is the best means of computing actual damage. It reflects the amount the insurance interests were willing to pay Pinkert for the damage and also reflects what the Court believes, based on the testimony, is the approximate market value depreciation of the coils due to non-waterline damage.

■ If plaintiffs failed to reasonably mitigate its loss, as ACBL contends, this damage award must be reduced. While the duty to mitigate lies with the plaintiff, the burden to show failure to mitigate is upon the defendant. *Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 514 (5th Cir.1974). ACBL alleges that plaintiffs failed to mitigate their damages in two respects. First, it alleges that plaintiffs unreasonably delayed the salvage sale to obtain additional surveys to establish the damage caused during ocean transit. However, as previously noted by the Court, all parties jointly inspected the coils at these surveys and no objection was made by ACBL at that time that the inspection was redundant. Thus, the Court finds that plaintiffs did not fail to mitigate their damages in this respect. Second, ACBL alleges that the condition of the coils deteriorated due to plaintiffs' failure to clean the coils and store them properly in the Ceres Warehouse. The Court's findings of fact on this issue reflect that plaintiffs' post discharge treatment of the coils was not unreasonable. *See* findings of fact Nos. 89, 92, and 93, supra.

■ Even if ACBL satisfied its burden of proving failure to mitigate damages, ACBL would nevertheless be liable for the full amount of the loss because it failed to prove the portion of the loss caused by plaintiffs' conduct. The difficulty of this burden in a factual situation similar to the case at bar was explained in *Compagnie de Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp.*, 316 F.2d 163 (5th Cir.1963), as follows:

> [W]e may quickly dispose of the contention here urged that the District Court erred is not reducing the award substantially because the damage was caused primarily by the failure of the consignee to minimize the loss. The assertion rests on the combination of dual facts. The first is that a considerable time elapsed between discharge from the vessel and the rehabilitory salvage work performed shortly after the joint surveys. The second one is the failure to follow the frequent practice of purposefully wetting down the cases so they remain thoroughly saturated until they can be opened, the glass plates removed and dried. But this was again not a principle of law, maritime, landbased or amphibious. It is a factual problem. Though one which a carrier may properly assert since there is a duty on the consignee to mitigate cargo damage, it is nevertheless a defense in extenuation. It operates on the working assumption that *some* damage for which the ship is responsible has occurred, but that proper steps will reduce or retard the damage. The Carrier is therefore faced with the somewhat formidable task—which Judge Browning has characterized as "a burden which may be difficult if not impossible to meet"—of first distinguishing between damage for which it is, and is not responsible, and second, shouldering the burden of any actor who asserts the doctrine of avoidable consequences.

*Id.* at 171 (citations omitted).

■ The Court also awards plaintiffs prejudgment interest from the date of the loss[41] and all costs. The standard for awarding prejudgment interest was thoroughly explained in *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026 (5th Cir. 1986):

41. January 10, 1985.

Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic. A trial court has the discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable. Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff. Moreover, in this Circuit prejudgment interest is ordinarily awarded from the date of loss. Prejudgment interest is usually awarded to the date of loss to ensure that the injured plaintiff is compensated for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgment.

*Id.* at 1028 (citations omitted).

Failure to award prejudgment interest in the case at bar would be an abuse of discretion. Considering the strength of plaintiffs' case, this litigation has been unnecessarily protracted and expensive. Prejudgment interest must be awarded to fully compensate plaintiffs for the absence of these funds. The Court fixes the rate of prejudgment interest at 9.08 percent (the T–Bill rates compiled in the Clerk's Office of the United States District Court for January 8, 1985, the date the barges arrived at Ceres Terminal in Chicago, Illinois, for unloading), compounded annually. *See Id.* at 1029; 28 U.S.C. § 1961(b). Plaintiffs shall also be awarded postjudgment interest at the legal rate established by 28 U.S.C. § 1961. Finally, pursuant to Fed.R.Civ.P. 54(d), costs are allowed as of course to the prevailing party.

### F. THE THIRD–PARTY COMPLAINT AGAINST THE STEVEDORES

Defendant, ACBL, filed a third-party complaint against T. Smith, the stevedore which loaded the coils into the barges in New Orleans. ACBL contends that T. Smith was obligated to perform its duties in a proper safe, and workmanlike manner. *See Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Defendants allege that the T. Smith's negligent and abusive handling of the cargo caused considerable physical damage such as rips, gouges, and indentations in the coils and torn and loosened covers. ACBL also alleges that T. Smith negligently failed to inform ACBL that puddles of water had formed on the hopper of ACBL 1323 and negligently proceeded to place water-sensitive cargo on wet tank tops without dunnage. Finally, ACBL contends that the thirteen-inch crack in the hopper of ACBL 1323 was the result of the stevedore negligently dropping the coils on the tank top of the hopper and puncturing the hopper with unprotected forklift blades during the placement of the coils. The third-party complaint seeks full indemnity whether or not ACBL is found responsible to plaintiffs. Pursuant to Fed. R.Civ.P. 42(b), ACBL's claim against T. Smith was severed at the pre-trial conference. Trial of the third-party claim was stayed until the Court renders its decision on the main demand.

Extensive testimony and documentary evidence was introduced at trial regarding the amount of damage to the cans and coils from the stevedoring operations in New Orleans, the amount of moisture on the tank top of ACBL 1323, and whether dunnage should be used in the transport of steel coils. Based on this evidence, the Court finds as follows:

1. The subsequent waterline damage was an intervening cause of negligence which relieves T. Smith of liability for the minor physical damage its stevedoring activity caused the coils. The testimony showed beyond a doubt that the cans in which the coils were placed were not designed to be watertight. The coils in ACBL 1323 sustained waterline damage equal to the level of the standing water regardless of whether the can was damaged. " 'Proof of a breach of the warranty of workmanlike performance does not ipso facto establish a right to indemnity. . . .

Obviously, if such breach is not an operative factor in the damages that occur, or if conduct on the part of the shipowner causes the injury ... indemnity should be denied.'" *Agrico Chemical Co. v. M/V BEN W. MARTIN*, 664 F.2d 85, 93 (5th Cir. Unit A 1981) (quoting *F.J. Walker, Ltd. v. Motor Vessel "LEMONCORE,"* 561 F.2d 1138, 1148 (5th Cir.1977)). *See also, Nat G. Harrison*, 516 F.2d at 97. Though proportional damages based on degrees of fault is the general rule for assessing damages in maritime property damage cases, the Court finds that T. Smith's negligence is not "an operative factor" in the waterline damage that occurred. Such damage would have occurred without regard to minor damage to the cans in question.

2. The moist sawdust on the floor of the hopper did not damage the coils. Such sawdust was present in all three barges. There is no evidence that steel was placed in one of the very isolated puddles in ACBL 1323. Even if a few coils had, the subsequent waterline damage from standing water was an intervening cause of negligence. The waterline damage would have occurred regardless of whether there was moist sawdust on the floor of the hopper. *See* discussion in preceding paragraph.

3. T. Smith was not negligent in placing the cans/coils directly on the tank top of ACBL 1323. Though it was not the custom in the Port of New Orleans at the time these coils were shipped to place dunnage under steel cargo for inland river barge transit, "[i]f under the circumstances the manner of stowing and dunnaging adopted was faulty and negligent, the existence of a custom so to do was not a good excuse. What ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." *United States v. M. Levy's Sons*, 288 F. 544, 546 (5th Cir.1923). From the evidence thus far presented, T. Smith exercised proper care in the stowage of the coils.[42] Though the four-inch dunnage ACBL argues should have been placed under the coils would have lessened the damage to the coils, the presence of 3000 gallons of water in ACBL 1323 was not anticipated. T. Smith was, therefore, not negligent in failing to guard against it. The overwhelming majority of the witnesses who testified on this issue stated that it is unnecessary to place dunnage on a river barge, which remains in interior waters and does not venture into heavy seas. River hopper barges are constructed differently from single skin LASH or SEABEE barges carried aboard mother ships in ocean carriage. River barges are "double walled" or "double bottomed" and should be safe from water leakage or water incursion. The testimony revealed that cargo carried in barges to Chicago usually arrive undamaged when the cargo is placed directly on the floor of the hopper without the use of dunnage. Therefore, the trial on the third-party complaint will be limited to whether the loading activities of T. Smith caused the thirteen-inch crack in the hopper of ACBL 1323.

Accordingly,

IT IS ORDERED that judgment be entered in favor of plaintiffs and against defendant, American Commercial Barge Line Company, in the amount of $338,969.38, plus prejudgment interest from January 10, 1985 to date at the rate of 9.08 percent, compounded annually, plus postjudgment interest at the legal rate, and all costs. Plaintiffs shall submit a judgment in accordance with this Order.

IT IS FURTHER ORDERED that the trial on the third-party complaint filed by defendant, American Commercial Barge Line Company, against third-party defendant, Cooper T. Smith & Sons, Inc., shall be limited to whether the loading procedures employed by T. Smith caused the thirteen-inch crack in the boundary angle of the hopper of ACBL 1323.

IT IS FURTHER ORDERED that the motion of defendant, American Commercial Lines, Inc., for involuntary dismissal pursuant to Fed.R.Civ.P. 41(b), is GRANTED.

42. Cooper T. Smith, being severed, did not present evidence at this trial.

## EXHIBIT A

**BOW**
(forward)

BARGE ACBL 1323

SIZE: 35' width X 200' length

4" water

13" crack

#1 wing tank
(18" water)*

water in
indents in
tank top

#1 wing tank
(dry)

*after pumping,
wing tank No. 1
had 1" water

waterline

#2 wing tank
(dry)

#2 wing tank
(dry)

PORT

STARBOARD

cargo hopper
tank top

#3 wing tank
(4" water)

#3 wing tank
(dry)

#4 wing tank
(4½" water)

#4 wing tank
(dry)

#5 wing tank
(4" water)

#5 wing tank
(dry)

8" water

3" water

STERN
(aft)